FRANK LODA ET AL. *v.* H. K. SARGEANT & ASSOCIATES, INC., ET AL.

PETERS, HEALEY, PARSKEY, ARMENTANO and SHEA, Js.

Argued May 14—decision released August 10, 1982

*Joseph E. Sakal,* for the appellants (plaintiffs).

*James R. Healey,* with whom was *Kevin P. Thornton,* for the appellees (defendant John H. Yanzo et al.).

*Joseph P. Flynn,* for the appellee (named defendant).

ARTHUR H. HEALEY, J. This action arises out of the nonperformance of a written contract for the sale of real estate. The plaintiff buyers brought an interpleader action to determine the respective parties' rights to the deposit of $7400. From a judgment of the trial court finding a breach of contract by the plaintiffs and awarding damages and attorney's fees to the defendants, the plaintiffs have appealed.

On February 25, 1979, the plaintiffs, Frank and Carmela Loda, made an offer to purchase a three-family house located at 96-98 Derby Avenue, Seymour, from the defendants John and Joan Yanzo. The Lodas wanted to purchase this house for investment purposes and also to provide housing for their daughter. The offer to purchase called for a purchase price of $73,000 conditioned upon the buyers' obtaining a conventional mortgage in the amount of $55,000 payable in not less than twenty-five years and at an annual percentage rate not to exceed 10½ percent.[1]

On the next day, February 26, 1979, after further negotiations, the plaintiffs increased their offer to $74,000 and signed a purchase and sale agreement to that effect. The agreement was made contingent upon the buyers' obtaining a conventional mortgage of $59,000 for a term of twenty-five years at a rate not to exceed 11 percent. It also contained a clause which stated that the "[s]ale [is] contingent upon Buyer obtaining [a] mortgage commitment no later than March 12, 1979." The buyers wanted the tenants on the second floor of the house evicted prior to the May 1 closing date and the agreement provided that $400 of the deposit would he held in escrow to be used toward the payment of reasonable attorney's fees in evicting the second floor tenants if they were still in possession at the closing date. The defendants Yanzo signed the agreement but it was not returned to the plaintiffs until March 6 or 7.

A deposit of $7400 was paid by the plaintiffs to the Yanzos' real estate agent, H. K. Sargeant, of

---

[1] Prior to this offer, the highest offer to purchase which the defendants had received for the property was $72,000. The defendants refused this offer.

the defendant H. K. Sargeant & Associates (Sargeant). The plaintiff Frank Loda, a real estate agent with ten years' experience, had previously agreed with the defendant Sargeant to split evenly the commission for the sale.[2]

On March 8, the plaintiffs applied to the Ansonia Savings Bank and the New Haven Savings Bank for a mortgage of $59,000 for a term of twenty-five years and at an interest rate of $10\frac{1}{4}$ percent. On March 12, the deadline specified in the agreement for obtaining a mortgage commitment, there was no indication by the plaintiffs to any of the defendants that they had not received a mortgage commitment. The plaintiffs learned from Peter Goumas of the Ansonia Savings Bank, on March 14, that their request for a $59,000 mortgage (80 percent of the sale price) was denied but that a $55,500 mortgage (75 percent of the sale price) over a term of twenty-five years and at an interest rate of $10\frac{3}{4}$ percent had been committed by the bank.[3] On that same day, the plaintiff Frank Loda telephoned H. K. Sargeant to tell him that he had a 75 percent mortgage commitment and to request assurance that the second floor tenants would be evicted before the closing date.[4] It was H. K. Sargeant's understanding after the March 14 telephone conversation with Loda that Loda, although desiring an 80 percent mortgage, would, if he did not get that, still proceed with the sale on the basis of the 75 percent mortgage already committed to him.

---

[2] As a co-broker on the sale with a commission at the rate of 6 percent, Frank Loda would obtain $2200 as his share from the defendant sellers.

[3] The New Haven Savings Bank subsequently approved only a $49,500 mortgage commitment.

[4] A written confirmation of this conversation was sent to the plaintiff Frank Loda from H. K. Sargeant on March 27, 1979. The tenants did vacate the second floor on May 1.

On March 15, the Lodas' attorney sent a letter to the attorney for defendants Yanzo requesting a copy of the notice to quit which the Lodas wanted served on the second floor tenants. The attorney for the defendants Yanzo, Lewis Whitehead, testified that he would not have sent such a notice to the tenants at this time if he had been aware that the Lodas did not intend to go through with the sale.

On March 26, Frank Loda signed the mortgage commitment papers at the Ansonia Savings Bank for $55,000 over twenty-five years at 10¾ percent. Carmela Loda signed on March 27. The Lodas never submitted an application for a mortgage at an interest rate of 11 percent. The plaintiffs maintain that they signed the mortgage commitment on Goumas' suggestion that to do so would hold the interest rate and so that he (Goumas) could resubmit the application to the mortgage committee at the Ansonia Savings Bank for a $3500 increase which would then total $59,000, i.e., the 80 percent financing which the Lodas originally desired. On Friday, March 30, or Monday, April 2, Goumas notified the Lodas that the requested increase in the mortgage commitment had been denied.

On April 9, Frank Loda called H. K. Sargeant, expressed displeasure regarding the 75 percent financing and indicated that because he was unable to secure 80 percent financing, he would not go through with the purchase of the property. This was the first indication which H. K. Sargeant had that the Lodas would not be purchasing the property. On April 12, the plaintiffs' attorney notified the attorney for the defendants Yanzo by letter that

the sales agreement was null and void due to the plaintiffs' inability to secure the specified financing. The Lodas purchased another house on April 16.[5]

On May 1, 1979, the Yanzos closed on a second home which they had committed to buy in anticipation of selling their Derby Avenue property to the Lodas. They were required to take a leeway loan of $50,000 from the Ansonia Savings Bank to finance this purchase while a new buyer was found for their property. The Derby Avenue property was finally sold on July 26, 1979, for a price of $71,500, the proceeds of which were used to pay off the leeway loan.

The plaintiffs brought this action for interpleader claiming that they were entitled to a return of the deposit according to the terms of the purchase and sale agreement[6] because they were unable to obtain a mortgage at the terms specified in the agreement. The court found that the plaintiffs had breached their contract with the defendants Yanzo and that the plaintiffs had waived the mortgage contingency clause by their actions. The court awarded damages and attorney's fees to the defendants Yanzo and attorney's fees and costs to the defendant H. K. Sargeant & Associates. These awards exceeded the amount of the $7400 deposit but the court, pursuant to General Statutes § 52-484, limited the damages to the $7400 figure.

On appeal, the plaintiffs basically raise four claims of error. They claim that the court erred (1) in finding that the plaintiffs waived the mort-

[5] Frank Loda testified that on April 16, 1979, he purchased other land in Seymour and later put a two-family house on it. It was then used as a residence by his son and daughter.

[6] This was followed by another interpleader action filed by the stakeholder, the defendant H. K. Sargeant & Associates, Inc., which was dismissed by the court on June 27, 1979, because it involved the same parties and relief sought as in the present suit.

gage contingency clause and did not give reasonable notice of termination of the agreement; (2) in the computation of the damages; (3) in allowing, in this interpleader action, contrary to law, "future" damages arising out of a breach of contract claim; and (4) in awarding excessive attorney's fees.

The plaintiffs first argue that the court erred in finding that the plaintiffs waived the mortgage contingency clause. In support of this, the plaintiffs also argue that they gave a reasonable termination notice, under the circumstances, because (1) the defendants, and not the plaintiffs, waived the March 12 mortgage contingency deadline; (2) the March 12 deadline was extended by a modification of the contract; and (3) there were, in reality, two contingency clauses,[7] one for the benefit of each party, which provided a different set of rights and obligations for each party. It is only necessary to discuss the first of these issues in connection with the trial court's conclusion that the plaintiffs' actions indicated a waiver of the mortgage contingency clause by them. Therefore, the primary issue which we must decide is whether the trial court's conclusion was clearly erroneous in light of the evidence and the record as a whole. *Kakalik* v. *Bernardo,* 184 Conn. 386, 393, 439 A.2d 1016 (1981), and cases cited therein.[8]

---

[7] The plaintiffs claim that the typewritten contingency clause, which required the buyer to obtain a mortgage commitment by March 12, was for the benefit of the seller who was already obligated to purchase a second house, and that a printed contingency clause, contained in the form contract, which allowed the buyer to declare the agreement null and void if he was unable to obtain the specified financing, was for the benefit of the buyer who desired a mortgage commitment in an amount not less than $59,000.

[8] In oral argument before us, the plaintiffs' counsel maintained not only that the trial court's conclusions were clearly erroneous but that there was evidence before the trial court that would have per-

In finding a waiver of the mortgage contingency clause, the trial·court necessarily found that the contingencies relating to both the time and the terms of the mortgage commitment had been waived. Waiver is a question of fact for the.trier. *Multiplastics, Inc.* v. *Arch Industries, Inc.,* 166 Conn. 280, 286, 348 A.2d 618 (1974) ; *Brauer* v. *Freccia,* 159 Conn. 289, 295, 268 A.2d 645 (1970). "Waiver does not have to be express, but 'may consist of acts or conduct from which waiver may be implied. *Andover* v. *Hartford Accident & Indemnity Co.,* 153 Conn. 439, 445, 217 A.2d 60 [1966]. In other words, waiver may be inferred from the circumstances if it is reasonable so to do. *DiFrancesco* v. *Zurich General Accident & Liability Ins. Co.,* 105 Conn. 162, 168, 134 A. 789 [1926].' *Breen* v. *Aetna Casualty & Surety Co.,* [153 Conn. 633, 646, 220 A.2d 254 (1966)] (dissenting opinion)." *Novella* v. *Hartford Accident & Indemnity Co.,* 163 Conn. 552, 562, 316 A.2d 394 (1972). "It is clear that the requirement of obtaining mortgage financing as a condition in a contract for the sale of realty must be given effect unless the condition has been altered by the parties or waived by the one for whose benefit the condition was made. *Traylor* v. *Grafton,* 273 Md. 649, 332 A.2d 651 (1975) ; *Barnes* v. *Euster,* 240 Md. 603, 214 A.2d 807 (1965)." *Bushmiller* v. *Schiller,* 35 Md. App. 1, 8, 368 A.2d 1044 (1977) ;

mitted it to find for the plaintiffs. In determining whether a trial court's conclusion is clearly erroneous, a "plaintiff's review in its brief of the evidence it presented to the trial court, undertaken to demonstrate the reliability of that evidence, does not avail it on appeal. We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. Rather, we focus on the conclusion of the trial court, as well as the method by which it arrived at that conclusion, to determine whether it is legally correct and factually supported." *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 222, 435 A.2d 24 (1980).

see *Koedding* v. *Slaughter,* 634 F.2d 1095, 1097 (8th Cir. 1980); *Lanna* v. *Greene,* 175 Conn. 453, 458, 399 A.2d 837 (1978); *Edwards* v. *McTyre,* 246 Ga. 302, 303, 271 S.E.2d 205 (1980); *Deal* v. *Dickson,* 231 Ga. 366, 367–68, 202 S.E.2d 41 (1973); *Blower* v. *Jones,* 226 Ga. 847, 848, 178 S.E.2d 172 (1970); *Lipscomb* v. *Chadbourne,* 378 So. 2d 147, 149 (La. App. 1979); *Dan Bunn, Inc.* v. *Brown,* 285 Or. 131, 590 P.2d 209 (1979); *Prestige House, Inc.* v. *Merrill,* 51 Or. App. 67, 624 P.2d 188 (1981); 3A Corbin, Contracts (1960) § 761, pp. 516–17.

There was evidence at trial which indicated that the March 12 mortgage commitment deadline was inserted for the benefit of the defendants Yanzo because they were in the process of buying another house and needed a buyer with a mortgage commitment as soon as possible. "The general rule [which is applicable here] is that a party for whose benefit a provision in a contract is intended may waive his rights under such provision. 3A Corbin, Contracts § 761." *Lanna* v. *Greene,* supra. It is clear that the Yanzos waived any requirement that the buyer obtain a mortgage commitment by that date because they continued their efforts to evict the second floor tenants and did not take any steps to relist the property or to terminate the agreement even though March 12 had passed.

There was also a clause in the agreement which stated the terms of the buyer's financing and provided that "[t]his agreement is contingent upon the Buyer obtaining a Conventional Bank mortgage of $59,000.00 for term of 25 years at rate of interest not to exceed 11.0%."[9] "A consideration of the

---

[9] Another clause, appearing directly below this clause, provided: "If Buyer is unable to obtain such financing, he may, by written notice to the Seller, declare this agreement null and void and any

agreement and the surrounding circumstances compels the conclusion that the financing contingency constituted a condition precedent imposed for the protection and benefit of the plaintiffs. See 77 Am. Jur. 2d, Vendor and Purchaser Sec. 366 p. 251 (1975). Indeed, the defendants had no ascertainable interest in the actual terms obtained by the plaintiffs. As such, the condition could be waived by the plaintiffs if they were willing to accept financing on less favorable terms." *Wolf* v. *Crosby,* 377 A.2d 22, 27 (Del. Ch. 1977); see *Lipscomb* v. *Chadbourne,* supra, 149.[10] We agree with the trial court that the plaintiffs' actions indicate a waiver of this mortgage contingency clause.

The court found three factual circumstances to be persuasive in its finding of waiver. First, on March 14, the day the plaintiffs learned that the Ansonia Savings Bank had approved a $55,500 mortgage commitment, the plaintiff Frank Loda called H. K. Sargeant requesting assurances that the tenants would be out by May 1. After this conversation it was H. K. Sargeant's impression that although Loda had not secured the 80 percent financing he originally desired, he would proceed with the purchase on the basis of the 75 percent financing which had been committed. Second, the court noted that on March 15, the plaintiffs' attorney sent a letter to the defendants' attorney requesting a copy of the notice to quit which the plaintiffs

---

payments made hereunder shall be returned to Buyer. Buyer agrees to apply for such financing immediately, and to pursue such application with diligence."

[10] It would be no defense that the plaintiffs' waiver of the financing contingency occurred after the March 12 deadline. "A promise to perform despite the failure of conditions of this nature may be made after the time set for the conditions' occurrence . . . ." *Koedding* v. *Slaughter,* 634 F.2d 1095 (8th Cir. 1980) and cases cited therein.

wanted served on the second floor tenants. The attorney, who represented the defendants at that time, testified that as a result, he wrote to the second floor tenants on March 20, 1979, requesting that they move out by May 1, 1979. There was also additional evidence demonstrating that the defendants took steps to have these tenants vacate before May 1 in reliance upon the plaintiffs' representations.[11] Finally, the court noted that the defendant John Yanzo testified that he was not told to relist the property by the plaintiffs on March 12 or within a reasonable time thereafter, even though the plaintiffs knew or should have known that the property was unlisted as a result of the February 26, 1979 contract. The court also found that the plaintiff Frank Loda's testimony that he never intended to go forward with 75 percent financing was uncorroborated, lacked credit, and was contrary to the evidence. The trier of fact is the judge of the credibility of witnesses and the weight to be accorded their testimony. *Toffolon* v. *Avon*, 173 Conn. 525, 530, 378 A.2d 580 (1977); *Tuccio* v. *Zehrung*, 172 Conn. 350, 354, 374 A.2d 1044 (1977).

These three factors, along with the evidence we have outlined above, reasonably demonstrate that the plaintiffs did, by their actions, agree to waive the financing contingency of the agreement and proceed with the sale with the 75 percent mortgage commitment received on March 14. The plaintiffs' signatures on the mortgage commitment papers on March 26 and 27 further reinforced this conclusion. At no time before April 9 did the plaintiffs indicate to the defendants that the 75 percent financing was unsatisfactory or that without 80 percent financing

[11] The defendant John Yanzo testified that he personally spoke to the tenants concerning their vacating the apartment by May 1, 1979.

there could be no sale. Their notice to the defendant Sargeant on April 9 that they would not go through with the sale on only 75 percent financing was a clear breach of the agreement and not, as the plaintiffs claim, reasonable notice of termination. We cannot say, on the basis of the evidence and record as a whole, that the trial court's conclusions were clearly erroneous. See *Kakalik* v. *Bernardo,* 184 Conn. 386, 393, 439 A.2d 1016 (1981).

The plaintiffs also claim that the trial court erred in the award of counsel fees and in the computation of damages. We will first address the damages claim. The court found damages for the defendants in the amount of $5099.02 as set out in the footnote.[12]

[12] "Original contract price

| | |
|---|---|
| Original contract price | $74,000.00 |
| Sales price of property following breach (Fair Market value) | 71,500.00 |
| Loss | 2,500.00 |
| Interest on leeway loan from May 1 to July 26 | 1,711.33 |
| Interest on first mortgage $3.17 per day From May 1—July 26 | 275.79 |
| Real property taxes at $1.78 per day From May 1—July 26 | 154.86 |
| Insurance payments at $.87 per day May 1—July 26 | 75.69 |
| Water and electric bills | 154.10 |
| Loss of rent on second floor apartment $190.00 per month May 1—July 1 | 380.00 |
| Total Loss | $5,251.77 |
| Less the 6% commission reflected in the different sales prices $150.00 | |
| Less tax stamp saving 2.75 | 152.75 |
| Total Loss sustained by Yanzos .................. | $5,099.02" |

The general rule for measuring damages in a contract action is that the award should place the injured party in the same position as he would have been in had the contract been performed. *Danpar Associates* v. *Somersville Mills Sales Room, Inc.,* 182 Conn. 444, 446, 438 A.2d 708 (1980); *Lar-Rob Bus Corporation* v. *Fairfield,* 170 Conn. 397, 404-405, 365 A.2d 1086 (1976); *Bertozzi* v. *McCarthy,* 164 Conn. 463, 468, 323 A.2d 553 (1973); *Lee* v. *Harris,* 85 Conn. 212, 214, 82 A. 186 (1912); 5 Corbin, Contracts § 992; McCormick, Damages § 137.

The plaintiffs' first claim is that the court erred by not reducing the damages by the amount saved by reason of the defendant Sargeant taking a reduced real estate commission on the eventual sale of the property to a third party. The real estate commission of 6 percent of the sales price of $74,000 would have amounted to $4400[13] had the original sale gone through as anticipated. When the property was actually sold on July 26 to the subsequent buyers, the defendant Sargeant had reduced its commission to a flat fee of $3500. This represented a savings of $900 to the defendants Yanzo. The trial court found that the plaintiffs had "no standing to become a direct beneficiary" of any savings from the private agreement between the Yanzos and Sargeant. With respect to the difference in commissions, the court merely deducted the difference between 6 percent of the different sales prices from the damages awarded to the defendants.

To deny the plaintiffs' claim would be to overcompensate the defendants Yanzo for their loss.

[13] By agreement between the plaintiffs and the defendant Sargeant, this $4400 was to be split evenly in a co-broke arrangement since the plaintiff Frank Loda was, himself, a real estate agent.

The goal is to put the defendants in the same position they would be in if the contract had been fully performed; see *Johnson* v. *Healy,* 176 Conn. 97, 105, 405 A.2d 54 (1978); *Levesque* v. *D & M Builders, Inc.,* 170 Conn. 177, 180–81, 365 A.2d 1216 (1976); and no better. It cannot be ignored that Sargeant's commission was $3500 and not $4400. Even though this was a "private agreement" between the Yanzos and Sargeant, its effect was to place the defendants Yanzo in a better position than they would have been in if the original contract had been fully performed. Therefore, the $900 difference must be credited against the damages owned to the defendant. See *Koedding* v. *Slaughter,* 481 F. Sup. 1233, 1240 (E.D. Mo. 1979), aff'd, 634 F.2d 1095 (8th Cir. 1980).

The plaintiffs' second claim is that the court erred in not finding a $300 difference in the two sales prices, rather than a $2500 difference. The court arrived at its figure by subtracting the actual sales price of $71,500 from the contract price of $74,000. The plaintiffs claim Frank Loda's co-broke arrangement with Sargeant in which the $4400 commission was split in half effectively reduced the contract sales price by $2200 to $71,800 thus resulting in only a $300 difference. We do not agree.

"The measure of damages for breach of contract of sale is the difference between the *contract price* and the value of the property at the time of the breach of the contract. These damages represent the loss of the bargain. 8 Thompson, Real Property (Perm. Ed.) § 4619; *Wells* v. *Abernethy,* 5 Conn. 222, 226 [1824]; *Makusevich* v. *Gotta,* 107 Conn. 207, 210 [139 A.2d 780 (1927)]." (Emphasis added.) *McLean* v. *Patterson,* 20 Conn. Sup. 367, 371,

135 A.2d 603 (1957); see *Gray* v. *Greenblatt,*
113 Conn. 535, 537, 155 A. 707 (1931). The contract
price was $74,000. It makes no difference, in a
calculation of damages, that the broker has agreed
to split the commission with the buyer. In either
case, the amount of money, i.e., the contract price,
paid to the seller remains unchanged and is the
proper measure for calculating damages.

The third claim of error presented by the plain-
tiffs concerns the award of $380 for loss of rent
following the eviction of the second floor tenants on
May 1. The court made this award without deduc-
tions for expenses to maintain the house and in
addition to other awards for interest on the first
mortgage, real property taxes, insurance payments
and utility bills. The plaintiffs claim that this was
incorrect because these other expenses would nor-
mally be paid from the gross rental receipts. The
plaintiffs request that these expenses be totaled
and divided by three to determine the second floor
tenants' proportionate share of the expenses. This
proportionate share, the plaintiffs claim, should
then be deducted from the $380 gross rent awarded.

The defendants Yanzo, at oral argument, con-
ceded that the award of $380 for the loss of rental
was incorrectly given and agreed to a reduction in
the damages in that amount. It would be a double
benefit to the defendants to allow them to recover
not only the itemized expenses from May 1 to July
26 but also the rental income from which some or
all of those expenses would be paid. We therefore
reduce the damage award by $380. The effect of
this reduction will be merely to compensate the
defendants for the expenses of maintaining the
house from May 1 to July 26.

We will now address the various claims for attorney's fees. All three parties made a claim, at trial, for attorney's fees. The trial court awarded the defendant Sargeant, who was the stakeholder, $400 for reasonable attorney's fees and $65.70 in costs. It also awarded the defendants Yanzo $2450 for reasonable attorney's fees. Since General Statutes § 52-484, however, limits the total damages in an interpleader action to the amount of the fund in controversy and since the total damages exceeded the amount of the fund,[14] the court simply ordered that the entire fund, except for the $465.70 awarded to Sargeant, be paid to the Yanzos. No attorney's fees were awarded to the plaintiffs.[15]

The plaintiffs claim that the court awarded excessive attorney's fees and that, if the plaintiffs prevail on this appeal, their claim for costs and counsel fees should be granted.

General Statutes § 52-484 provides that the trial court "may tax costs at its discretion and, under the rules applicable to an action of interpleader, may allow to one or more of the parties a reasonable sum or sums for counsel fees and disbursements, payable out of such fund . . . ." It is well settled that this statute allows the court to award a stakeholder reasonable attorney's fees and expenses. *Phoenix Ins. Co.* v. *Carey,* 80 Conn. 426, 431, 68 A. 993 (1908). The trial court has a wide discretion in making its awards, subject to review only for an abuse of that discretion. *Driscoll* v. *Norwich Sav-*

[14] The fund amounted to $7400. The damages totaled $8014.72 ($5099.02 plus $465.70 plus $2450).

[15] At the close of the trial, when counsel argued the matter of counsel fees, the plaintiffs' counsel claimed that counsel fees should be paid by the defendants Yanzo. Counsel for the plaintiffs and the defendants each asked for counsel fees in the amount of $3000.

*ings Society,* 139 Conn. 346, 351–52, 93 A.2d 925 (1952); *Podzunas* v. *Prudential Ins. Co.,* 125 Conn. 581, 583, 7 A.2d 657 (1939).

The plaintiffs claim that the award of $2450 in attorney's fees was excessive and that the trial court was influenced to the prejudice of the plaintiffs by evidence of the $900,000 financial worth of Frank Loda. They allege that the trial court demonstrated its prejudice when it commented that "[t]he question should allude to why was Mr. Loda, being almost a mulitimillionaire [sic], coming into this property as owner occupant." We note, however, that no objection or exception was taken to this testimony, elicited on cross-examination, by the plaintiff. The court's comment came at the end of the plaintiff Frank Loda's testimony at a time when the court was trying to clear up some confusion as to why Frank Loda, rather than his daughter and son-in-law, decided to purchase the property when Loda knew that the Ansonia Savings Bank would approve 80 percent financing only in owner-occupied dwellings.[16]

"No more elementary statement concerning the judiciary can be made than that the conduct of the trial judge must be characterized by the highest

---

[16] This observation was made where the examination of Frank Loda disclosed that his daughter and her husband-to-be contemplated the purchase of the Yanzo house on the first day they looked at it. The question and answer just prior to the court's observation were as follows: "[Q.] And after discussing it with the family you decided that you would purchase or you and your wife would purchase the property? [A.] I was considering the question as to whether I would." The defendants' counsel objected but withdrew the objection. At that time, the plaintiffs' counsel said, "I just have one further question along this line. Why in particular did, for what reason—" It was at that point that the court made the observation which the plaintiffs now attack.

degree of impartiality. If he departs from this standard, he casts serious reflection upon the system of which he is a part. A judge is not an umpire in a forensic encounter. *Strong* v. *Carrier,* 116 Conn. 262, 263, 164 A. 501 [1933]. . . .

"Not every departure from the norm, however, in reversible error. Prejudice to the unsuccessful party, or at least the possibility of it, must appear to have occurred before this court will be justified in depriving the successful party of the result of the litigation which, so far as it was affected by his actions, he has obtained by fair means. *Wood* v. *Holah,* 80 Conn. 314, 316, 68 A. 323 [1907]; *Pettibone* v. *Phelps,* 13 Conn. 445, 450 [1840]. Furthermore, assignments of error directed to the conduct or statements of the trial judge will not ordinarily be considered on appeal in the absence of an exception taken at the time. *Drum-Flato Commission Co.* v. *Edmisson,* 208 U.S. 534, 540, 28 S. Ct. 367, 52 L. Ed. 606 [1908]; *State* v. *Dobbins,* 152 Iowa 632, 641, 132 N.W. 805 [1911]; *Hummelshime* v. *State,* 125 Md. 563, 569, 93 A. 990 [1915]; *Harrington* v. *Boston Elevated Ry. Co.,* 229 Mass. 421, 434, 118 N.E. 880 [1918]; *Seiner* v. *State,* 138 Neb. 130, 132, 292 N.W. 112 [1940]; *Pelton* v. *Spider Lake Sawmill & Lumber Co.,* 132 Wis. 219, 231, 112 N.W. 29 [1907]." *Felix* v. *Hall-Brooke Sanitarium,* 140 Conn. 496, 501–502, 101 A.2d 500 (1953).

Upon reviewing the entire record, we cannot find any real possibility of harm, as claimed, to the plaintiff as reflected in the award of counsel fees or for that matter in the disposition of this case. In fact, we can find no abuse of discretion in the award of attorney's fees and costs to either of the defendants. See *Piantedosi* v. *Floridia,* 186 Conn. 275, 279,

440 A.2d 977 (1982). The trial court had the entire file before it from which it could approximate the number of hours devoted to the pleadings. See *Piantedosi* v. *Floridia,* supra. There was also evidence that the defendant Sargeant's counsel had expended seven hours[17] and that counsel for the defendants Yanzo had expended approximately thirty-five hours in the matter, excluding the actual three days of trial. We have stated that " 'courts have a general knowledge of what would be a reasonable compensation for services which are fairly stated and described.' " *Piantedosi* v. *Floridia,* supra; see *Appliances, Inc.* v. *Yost,* 186 Conn. 673, 680–81, 443 A.2d 486 (1982). The defendants Yanzo had originally asked for $3000 in attorney's fees and disbursements but the court only awarded $2450. The attorney's fees and costs awards are reasonable and no abuse of discretion or prejudice to the plaintiffs has been demonstrated.

The plaintiffs' remaining arguments merit little consideration. First, they claim that the defendants Yanzo improperly attempted to garnish the $7400 deposit by writing to the defendant Sargeant on April 12, 1979, stating, "we do hereby make demand on you not to release sums held by you in escrow concerning this sale until such time as this matter is adjudicated." Specifically, the plaintiffs

---

[17] The brief of the defendant H. K. Sargeant & Associates, Inc. indicates that its counsel appeared in court three times in connection with this case. It also indicates that he filed pleadings and a brief directed to certain claims of illegality and unconstitutionality in the holding of the deposit money by Sargeant which the plaintiffs had placed in their interpleader complaint and which was later amended to exclude them.

claim that this procedure improperly circumvented the prejudgment remedy statutes, General Statutes § 52-278a et seq.[18]

The short answer to this is to point out that it was the plaintiffs, themselves, who instituted the judicial proceedings in this case by filing the interpleader action on June 5, 1979. This effectively deprived any party of use of the fund until there was a judicial resolution of the rights of the parties claiming such fund. General Statutes § 52-484; Practice Book § 537 et seq. The defendants simply did not attempt to garnish or otherwise bring a civil action to resolve this controversy.

The plaintiffs also claim that the trial court's judgment was contrary to applicable law in that a claim for future damages cannot be made in an interpleader action. They allege that as of the date of the breach, April 9,[19] there were no damages actually suffered by the defendant, but "merely a fear of future potential damages." This, the plaintiffs claim, is not a proper element of damages in an interpleader action.

The plaintiffs have presented us with no authority for this novel argument. Suffice it to say that by

[18] The plaintiffs also claim that they were denied a "right to a hearing in probable cause under the constitution and the prejudgment remedy statute . . . ." This argument was raised below but the court felt that no constitutional question was presented by this case and it did not address it in its memorandum of decision. Since the plaintiff did not move for rectification of the appeal; Practice Book § 3082; or completion of the record; Practice Book § 3096 (1); there is nothing for us to review. We will not address this claim on the basis of this record. See *Mechanics Savings Bank* v. *Tucker*, 178 Conn. 640, 646-47, 425 A.2d 124 (1979).

[19] The plaintiffs feel that March 12 was the date of the breach. However, since we have found a waiver of this term, we consider the date of breach to be April 9.

their actions, the defendants were merely fulfilling their duty to mitigate damages occasioned by the plaintiffs' breach; see *Danpar Associates* v. *Somersville Mills Sales Room, Inc.,* supra, 446; *Willametz* v. *Goldfeld,* 171 Conn. 622, 627, 370 A.2d 1089 (1976); and no authority that we know of prevents a recovery of such damages in an interpleader action.

To summarize, the defendants are entitled to the following damages:

| | |
|---|---:|
| Original contract price | $74,000.00 |
| Sales price of property following breach (Fair Market value) | 71,500.00 |
| Loss | 2,500.00 |
| Interest on leeway loan from May 1—July 26 | 1,711.33 |
| Interest on first mortgage $3.17 per day from May 1—July 26 | 275.79 |
| Real property taxes at $1.78 per day from May 1—July 26 | 154.86 |
| Insurance payments at $.87 per day from May 1—July 26 | 75.69 |
| Water and electric bills | 154.10 |
| Total Loss | $4871.77 |
| Less the $900 difference between Commissions $900.00 | |
| Less tax stamp saving · 2.75 | 902.75 |
| Total loss sustained by Yanzo | $3969.02 |

When the total loss is combined with the $2450 attorney's fee for the defendants Yanzo and the $465.70 attorney's fees and costs for the defendant

Sargeant, the amount of $515.28 remains from the $7400 fund. This amount is to be paid over to the plaintiffs.

There is error, the judgment is set aside, and the case is remanded for the rendition of judgment in conformity with this opinion.

In this opinion the other judges concurred.