[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The above two class actions, were instituted in 1987 and were consolidated in 1988. Thereafter, the court (Gormley, J.) granted the plaintiffs' motion for summary judgment in each case. The undersigned to whom the motion was referred as a state trial referee thereafter heard them together as a hearing in damages for the purpose of determining what damages were due to the class members as a result of the defendants' violations of four agreements affecting certain property owned by them in Wallingford.
In these two complex cases[1] certain facts may initially be set out and where differences exist they will be referred, to as necessary. Dwayne Braithwaite and Henry Renfrew are the representative plaintiffs who instituted these actions in dockets #262168 and #262169 respectively and each is a resident of the town of Wallingford. The named defendants in each action are the town of Wallingford, (Town) a municipal corporation organized under Connecticut law and the Public Utilities Commission of the Town of Wallingford (PUC) which is an agency of the Town. For convenience the defendants, therefore, will be referred as the Town as occasion permits.
These cases involve the violation of four agreements which have been recorded in the Wallingford Land Records since early in the 1950's. Two of these agreements involve the Braithwaite case and two involve the Renfrew case. On or about November 9, 1950 the Borough of Wallingford (Borough) entered into an agreement with West View Hills Inc. (West View agreement) concerning the construction by Westview of sanitary sewers outside the territorial limits of the Borough which were to serve approximately 157 building lots in a subdivision owned by West View off East Main Street in Wallingford. In addition to West View agreeing to constructing these sewers it was also agreed that CT Page 5268 upon the completion of the sewers that the ". . . same shall be transferred to and become the property of the Borough . . . and the proper easements will be granted to the Borough . . . over the roads and laterals onto and within which said sewers are to be constructed, and that said sanitary sewers will be the property of the Borough in the same manner the sewers within the territorial limits of the Borough are presently owned and maintained by said Borough of Wallingford . . ." and it further provided that, "In consideration of the expense of the installation of said sanitary sewers and its transfer of title to the Borough, the Borough of Wallingford agrees to maintain said sanitary sewers for a period of 99 years from date hereof as maintenance is had for sanitary sewers within the territorial limits of the Borough of Wallingford. This contract shall inure to the benefit of, and be the obligation of, the successors, heirs and assigns of both parties hereto for the period hereinabove stipulated. In consideration of the mutual covenants set forth in this contract, it is further mutually agreed and intended that all the sewage from said above described sanitary sewerage installations will be discharged for the period of 99 years from the date hereof into the sewerage system of the said Borough of Wallingford. It is further agreed that the Borough of Wallingford shall receive in compensation for allowing said sewage to be discharged into its sewerage system and for the obligation of the Borough to maintain same for said 99 year period from the record owner of each dwelling unit erected on said 44 plots a payment to the Borough Wallingford for the sum of $10.00 per dwelling unit per year. The Borough, however, reserves unto itself, the right to increase or decrease the sum of $10.00 per dwelling unit per year, but any increase shall never exceed the sum to make the total charge of $15.00 per dwelling unit per year for the full period hereinabove stipulated. It is further agreed that the method and terms of payments with reference to time and manner of payment shall be as determined by the Borough of Wallingford, and that there shall appear in the deeds to prospective and future owners of houses to be erected on said plots, a statement to the effect that said payment of said $10.00 per year or any increase or decrease aforementioned, is a covenant running with the land."
On or about April 29, 1952, the Borough also entered into an agreement with Charles L. Williams, Robert C. Williams, Sarah E. Carr, Florence W. Kingsland and Elsie W. Reynolds (Kingsland agreement) concerning the construction of sanitary sewers outside the territorial limits of the Borough which were to serve approximately 112 building lots owned by by Kingsland et als. off East Main Street and East Side Drive in Wallingford. The Kingsland agreement was the same as the West View agreement. The West View and Kingsland agreements are the agreements involved in the Braithwaite case. CT Page 5269
On or about July 7, 1953, the Borough and Norshap Corporation also entered into an agreement (Norshap agreement) concerning the construction of sanitary sewers outside the territorial limits of the Borough which were to serve approximately 22 building lots in a subdivision owned by Norshap and located on Kondracki Lane in Wallingford. The Norshap agreement was the same as the West View and Kingsland agreements.
On or about July 17, 1953, the Borough entered into an agreement with Rosewood Homes Inc. (Rosewood agreement) concerning the construction of sanitary sewers outside the territorial limits of the Borough which were to serve approximately 44 building lots located on Audette Drive and East Side Drive on Wallingford. The Rosewood agreement was the same as the earlier three agreements. The Norshap and Rosewood agreements are the agreements involved in the Renfrew case. All four agreements were recorded in the Wallingford Land Records shortly after their execution. Dwayne Braithwaite is a successor in interest to the West View agreement and Henry Renfrew a successor in interest to the Rosewood agreement.
At the time the four agreements referred to were executed, the four areas covered by these agreements were outside the territorial limits of the Borough of Wallingford. At that time the Town of Wallingford had no sewer system and the Borough did not charge its residents for the use of its sewer system. Rather, the Borough residents paid for the sewer system through general taxation.
Pursuant, however, to Special Act No. 49 of the Connecticut General Assembly (1957) the Borough of Wallingford was consolidated into the town of Wallingford effective January 1, 1958. Under that special act all obligations and liabilities of the Borough of Wallingford were assumed by the town of Wallingford following the effective date of that act.
In November 1986, the PUC increased its sewer use fees to Wallingford residents approximately $122.00 per year and, on February 3, 1987 the PUC declared all four of the foregoing agreements null and void. This null and void declaration of the agreements, practically speaking, removed these agreements as an "impediment" to the Town's being capable of obtaining and using the benefits of federal and state grants to defray the cost of a modern sewage water treatment plant for the town of Wallingford. Claiming a violation of the agreements the Braithwaite and Renfrew actions were instituted. Both actions were started after some owners in areas subject to the agreements formed a group which in turn contacted property owners in the areas covered by all four of the agreements challenging the propriety and validity of the defendants in abrogating their $15 sewer use cap as set out in CT Page 5270 each of recorded agreements and which $15 cap the owners maintained they were entitled to have kept inviolate for the balance of the term of years under the respective agreements.
At this point a review of the case claims in the complaints in these two actions will be useful. The Braithwaite complaint which concerns the West View and Kingsland agreements is in five counts. Briefly stated the counts there seek the following: the first count requests a declaratory judgment that the West View and Kingsland agreements are valid and enforceable as covenants running with the land and a declaration of the rights of the plaintiff and the duties and obligations of the defendants; the second count, maintaining that the agreements concern covenants running with the land which are an interest in real property, seeks specific performance of the agreements by the defendants; the third count, maintaining that the agreements concern covenants, running with the land, contends that the breach of the agreements by the defendants has caused the plaintiff irreparable harm and that there is no adequate remedy at law; the fourth count, realleging the nature of the covenants, claims that the action of the PUC in increasing the annual sewer use rate of the plaintiff and other lot owners benefited by the agreements constitute a breach of these agreements and that their being billed in excess of $15.00 for sewer use fees has caused them financial detriment and damages and the fifth count, asserting the large numbers of lot owners affected, the commonality of questions raised, the superiority of the class action procedure in these cases requests class action status as the fair and practical method of resolving the common questions involved.
The defendants in Braithwaite admit the existence of the West View and Kingsland agreements, the consolidation of the Borough into the Town with the assumption of the obligations and liabilities of the Borough by the Town pursuant to the 1957 Special Act, the December 1986 increase by the PUC of the sewer use fees of the plaintiff and other lot owners covered by the agreements from $15. per year to approximately $122. per year and the February 3, 1987 declaration by the PUC that the agreements were null and void. They deny that the agreements are valid and enforceable. They also deny that the plaintiffs are entitled to specific performance, that the alleged breach has caused them irreparable harm and that they have no adequate remedy at law and that the PUC action in increasing the annual sewer use fees of the plaintiffs constituted a breach of the agreements as well as causing the plaintiff financial detriment and damages. As to the fifth count while admitting the allegations going to seeking class action status in these cases the defendants plead insufficient knowledge to form a belief that the plaintiff will fairly and adequately protect the interests of all owners of the lots involved. CT Page 5271
By way of relief the Braithwaite complaint seeks class action certification, a declaratory judgment that the agreements are valid and enforceable and which prohibits the defendants from imposing sewer use fees upon the plaintiff and class members in excess of $15. per year during the remainder of the term of the agreements, permanent injunction enjoining the defendant Town, all its municipal departments and agencies including the defendant PUC from charging, collecting or assessing more than $15. per year from the named plaintiff and other class members for sewer use fees for the remainder of the term of the agreements, and from filing liens against the real property of any of them for failure to pay for previously billed and unpaid sewer use fees in excess of $15. per year, an order for specific performance of the agreements by the defendants, monetary damages, punitive damages, reasonable attorneys' fee, interest and costs and such other and further relief to which the plaintiff may be entitled in law or equity.
The defendants in Braithwaite also have pleaded six special defenses to all the counts. First, they allege that the agreements are unenforceable because they are inconsistent with and are superceded by the Federal Water Pollution Control Act,33 U.S.C. § 1251 et seq. also known as the Clean Water Act of 1977; second, the provision in the agreement providing for a charge of no more than $15. per dwelling unit for a period of 99 years represents a surcharge[2] and in no way negates the imposition of additional charges for sewage treatment and disposal; third, that the agreements are unenforceable because performance is impracticable and their purpose has been frustrated; fourth, that the agreements are unenforceable as restrictive covenants because of substantially changed circumstances which imposed a disproportionate burden and hardship upon the defendants if they were to be enforced; fifth, that the agreements made by the Borough are null and void and are ultra vires and sixth, that the agreements are illegal and unenforceable because they are against public policy. All these special defenses are denied.
Turning to the Renfrew complaint, which concerns the Norshap and Rosewood agreements, discloses that it contains seven counts, the first four counts are similar to the Braithwaite complaint as are the defendants' answer. Renfrew asks the declaration of a declaratory judgment in the first count, an action for specific! performance in the second count, an action that the alleged breach of the agreement by the defendant has caused the plaintiffs therein irreparable harm with no adequate remedy at law in the third count and in the fourth count that the PUC action in increasing the annual sewer fees in excess of $15. per year being a breach of the agreement, has caused the plaintiff financial CT Page 5272 detriment and damages. In their fifth count, unlike that count in Braithwaite, Renfrew alleges that "For a long period of time some of the successors in interest to the original lot owners in the (Norshap and Rosewood) agreements have paid sewer use fees to the defendant PUC in excess of $15.00 per year" and that, in view of the restriction to a maximum charge of $15. per year for 99 years under the agreements, those who have so paid more "have been financially damaged by such overpayments and seek reimbursement with interest and costs"; the defendants deny the 99 year restriction as well as denying any reimbursement is to be had. The sixth counts includes allegations that the town or the PUC knew or should have known "that certain successors in interest to the original owners in the (Norshap and Rosewood) agreements paid more than $15. per year for sewer use fees, that nevertheless the Town or the PUC continued to collect more than $15. per from those lot owners, that such conduct by the Town or the PUC "was undertaken" so that such lot owners "would not complain or discover that their lots were included in one of the Agreements" and that "such conduct by the Town or the PUC was fraudulent and caused damage for those who overpaid their sewer use fees;" the defendants deny all these allegations. The seventh count requests class action status similar to that in Braithwaite. By way of relief the Renfrew complaint contains the same prayers as does the Braithwaite complaint.
The Renfrew defendants have also filed seven special defenses. The first six are interposed to all seven counts of the complaint and are the same as the six special defenses pleaded to the Braithwaite complaint. The seventh special defense, which is interposed to only the sixth and seventh counts, alleges that the claims made in those counts "are barred because they were not brought within the six year statute of limitations governing such contracts, Connecticut General Statutes 52-576."
The court (Fracasse, J.), on August 6, 1987, granted the plaintiffs' motions in both Braithwaite and Renfrew for certification as a class action, issued the appropriate orders concerning notice and publication upon which return was made. Both cases then proceeded as class action suits. Some time later, in August 1989, the court (Fracasse, J.) ordered an updating of the two classes which was done redefining the classes in each case.
During the pleading stage, the plaintiffs and the defendants in both Braithwaite and Renfrew filed motions for summary judgment. The plaintiffs in Braithwaite and Renfrew filed identical motions in each case moving for summary judgment on the first, second, third and fourth counts of each complaint. The defendants in each case filed identical motions moving for summary judgment on their first, third, fourth and/or sixth special CT Page 5273 defenses.
In a long and well-reasoned memorandum of decision, the court (Gormley, J.) denied the defendants' Motions in both cases. That court, however, granted the plaintiffs' motion for summary judgment on the third and fourth counts of their complaints. In granting summary judgment on the fourth count which is in breach of contract, the count said:
 "As there is no genuine issue of material fact in dispute regarding the breach of contract, summary judgment is granted to the plaintiff on that ground. There is no claim that the agreements in question were not valid and enforceable contracts at their inception. The Borough and now the Town received from the plaintiffs' predecessor everything that they bargained for. There is nothing more for the plaintiff class to do in performance of the agreements. The fact is the Town did perform for nearly 35 years." (emphasis added).
In its decision it further said that in granting summary judgment for the plaintiff on the third and fourth counts that, in doing so, "judgment is only granted as to the claim for damages, not specific performance." Immediately thereafter the court (Gormley, J.) notes:
 "In addition, the Court grants summary judgment for the plaintiff upon its claim that the actions of the defendants constituted an improper and unconstitutional taking of the plaintiff's property rights. The Court concludes that the complaint does in fact allege that the defendant's actions constituted a taking of a valuable property right. Although the Court need not determine this issue in light of its decision with reference to the breach of contract issue, it provides further support for the validity of the plaintiff's position. . . ." (emphasis added).
Later in its decision the court states that "It is submitted that the allegations of the plaintiff's complaint are sufficient to allege a cause of action for a "de facto taking". It goes on and says:" This court finds that the defendant's action in declaring the covenant, which it granted, null and void amounted to a de facto taking without compensation as its effect was to extinguish that right." That court also said "That this covenant limiting future increases in sewer changes has value is beyond CT Page 5274 question." It concluded that "no genuine issue of fact remains regarding the validity of the covenant as a property right with value, and summary judgment should enter. Again, the remedy available to the plaintiff class should be limited to an assessment of damages."
The post-trial briefs of the parties, which to some extent incorporate materials set out in their pretrial briefs make several claims. The plaintiffs' post-trial brief claims that (1) the proper measure of damages is the contract measure of damages. In this connection they argue that the proper measure of damages under both a breach of contract theory and a taking of a real property interest is essentially the same pointing out that both look "to put the plaintiff back in the same position as if the breach or taking had never occurred."; (2) regarding the proper measure of damages and the value of the remaining years of the agreements the court should accept the evidence adduced by its expert, Dr. Gary Crakes and not the measure of damages for the periods of years adduced through the defendant's experts, particularly Robert Parente and Philip Ball; (3) they are also entitled to be awarded punitive damages because the evidence "indicates that the Town operated with a reckless indifference to the rights of the plaintiff classes and in intentional violation of those rights"; (4) the claims of members of some or all of the members of the Renfrew class are not barred by, inter alia, the statute of limitations as the defendants claim; (5) the actual class in the two cases is composed of those persons listed in plaintiffs' Exhibit G or their successors or assigns who own any of the 335 properties listed in the four agreements minus those persons who have "opted out" of each class and (6) any further equitable relief which the court deems necessary and just.
The defendant's post-trial brief claims that (1) the appropriate measure of danger is not "a strict legal breach of contract measure" but is one based on the law of eminent domain and the condemnation of property. After discussing the just compensation rule for a partial taking with its "before and after rule" it sets out its "alternative method" for evaluating the sewer use caps of the plaintiffs as formulated by their experts Parente and Ball both of whom believed that the caps "had some value" but only for a period of years considerably less than the number of years remaining on each of the four agreements, (2) the plaintiffs have failed to properly allege or prove that they are entitled to an award of punitive damages; (3) the recovery of alleged overpayments by Renfrew class members is barred since their claims were not timely raised, the ramifications of which including the defense of the statute of limitations and fraudulent concealment are discussed below and (4) the plaintiffs failed to sustain their burden of proving damages for 118 class members in these cases. CT Page 5275
Some examination of these agreements, the circumstances surrounding them and certain legal principles will be of assistance on the measure of damages issue. Initially, we note that each of the four recorded instruments which are captioned "Agreement" specifically refer to each "Agreement" as a "contract" and that the parties honored each as drafted for many years before the "null and void" declaration of them on February 3, 1987.
Each agreement was intended to remain in force for a term of 99 years from the time of their execution in return for the developer in each agreement paying the total cost of installing, instructing and connecting the sanitary sewers and turning them over to the Borough. The Borough and its successors or assigns "intended" (as did each developer) that all sewage from such sewage installations "will be discharged for the period of 99 years . . . into the sewage system of . . . the Borough". Furthermore, it was agreed that "the Borough shall receive in compensation (for allowing the discharge of such sewage into its sewage system)" . . . and for the obligation to maintain (this system) for said 99 year period from the record owner of each dwelling unit. . ." $10 per year . . ." with the Borough reserving to itself, the right to increase (the $10.) . . . but any such increase shall never exceed . . . $15.00 per dwelling unit per year for the full period hereinabove stipulated." (Emphasis added) Immediately thereafter, it provided that ". . . the method and terms of payments with reference to time and manner of payment shall be as determined by the Borough, and that there shall appear in the deeds to prospective and future owners of house to be erected on said plots, a statement to the effect that said payment of $10.00 per year or any increase . . . is a covenant running with the land."
The term "covenant" in its widest sense, "is used to indicate a contract, while the more specific application of the term imports an agreement reduced to writing and duly extended whereby one or more of the parties named (in it) engages that a named act is already performed or is to be performed sometime in the future. A covenant may also call for the performance or nonperformance of some specified duty, and may constitute an agreement to do or not to do a particular act." 20 Am.Jr.2d, Covenants, etc. 1. It is, of course, "intrinsic in the word `covenant' that it contain a promise . . ." Adam v. Consolini, 135 Conn. 321, 325 A.2d 44 (1949). Each of these four agreements clearly do so. The construction of the covenants in these circumstances are generally the same as that applicable to any contract or covenant, including the rule that where there is no ambiguity in the language used, there is no room for construction and the plain meaning of the language controls. 20 Am.Jur.2d Covenants 135.
There is no ambiguity in these agreements. The fair CT Page 5276 expectation of the parties is evident from examining the agreements. Basically, then the question becomes one of the intention of the parties as shown by the covenants, and, there the four agreements and all the circumstances surrounding the making of them may be considered. See Katsoff v. Lucertini, 141 Conn. 74,77-78, 103 A.2d 812 (1954); Bauby v. Krasow, 107 Conn. 109,139 A.2d 508 (1927). "The intention of the parties, gathered from their words, is gathered, not by reading a single clause of the covenant but . . . by reading its entire context." Moore v. Serafin, 163 Conn. 1, 10, 301 A.2d 238 (1972) and cases there cited.
The agreements, so viewed, clearly state the bargain, the contract between the parties and that bargain was honored for many years. The performance promised therein, including the specific term of years, support the claim that the conduct of the parties supply meaning to their mutual understanding of the bargain made. See Hamden Holding Corp. v. United Men's Shops Inc., 127 Conn. 500,502, 18 A.2d 356 (1941); 3 Corbin on Contracts 557.
Despite the clear language that these agreements are to endure for 99 years from their inception, the defendants maintain that the only property owners who can assert the enforcement of those covenants are those who held title on February 3, 1987 and or those who became owners thereafter by virtue of having an "assignment" from one who was an owner as of February 3, 1987 and who transferred the right to assert those covenants by "assigning" them. This claim leads the court to an examination of the statement in each contract that all deeds of any plot covered by the agreement shall include "a statement to the effect that said payment by $10.00 per year or any increase . . ., is a covenant running with the land." (emphasis added). It is appropriate in proceeding with this inquiry to keep in mind that each agreement specifically provides that "this contract (agreement) shall inure to the benefit of, and to the obligation of, the successors, heirs, and assigns of both parties herein for the period hereinabove stipulated." (emphasis added). Long ago our Supreme Court said: "Covenants real alone pass by deed to the grantees; but covenants personal do not." Davis v. Lyman, 6 Conn. 249, 255 (1826). In deciding whether we have covenants real i.e. one running with the land in these cases, we find that to be such the real property of the plaintiffs must be land which the parties intended to benefit by the covenant and the covenant itself must "touch or concern" the land. Gulf Oil Corp. v. Fall River Housing Authority,364 Mass. 492, 498, 306 N.E.2d 257 (1974); Am. Law of Property 9.4, 9.5 (1952); Carlson v. Libby, 137 Conn. 362, 77 A.2d 332 (1950); 3 Tiffany Real Property 850, 854. To state it another way, as Judge Clark did in citing the well-known case of Savage v. Mason, 3 Cush (5) Mass.) 500, 505 (1849). "A covenant is said to run with the land, when either the liability to perform it or the CT Page 5277 right to take advantage of it passes to the assignee of the land." Charles Clark, "Real Covenants and Other Interests which Run with the Land" p. 102 (1947). The determination of whether a covenant runs with the land requires a showing that the benefit or burden of the promises was intended to run with the land, that the promises made substantially altered the legal relations of the parties with respect to the land i.e, that the promises "touch or concern" the land and that a succession of interest existed between the promises and promisee. Traficante v. Pope,115 N. H. 356, 359, 341 A.2d 782 (1975); Branford Realty Corporation v. Beetz, 108 Conn. 26, 30, 142, A, 395, (1928); 5 R. Powell Real Property 674; 3 Tiffany, Real Property 854. If a covenant can be said to run with the land, then its benefit or obligation passes with the ownership. See e.g. Greenspon v. Rehberg,224 N.W.2d 67, 73 (Mich.App. 1975) quoting Mueller v. Bankers Trust Co. 53, 56, 247 N.W. 103 (1933); Kegel v. Pedz, 316 Ill. 318,147 N.E. 286, 88 A1 1151 (1925). A word about the use of the term "assigns". The claim of the defendants of the need for an "assignment" by one becoming an owner after February 3, 1987 has been referred to. It does not appear that it is essential that words of inheritance or succession need always be used to make a covenant real, i.e. use running with the land although the only certain method of avoiding controversy and making sure is to use such words. 2 Amer. Law of Property of 9.3 (1962); see also Brown v. Connecticut Light Power Co., 145 Conn. 290, 299, 141 A.2d 634
(1988). That, however presents no problem as such words evidencing the intent to be so bound (and benefited) are used clearly in each agreement — and carry with them the legal consequence that they are used for the purpose of declaring the intent to so be bound (and benefitted [benefited]) whether a natural person or corporation is involved.
It is concluded that the covenant in each of the four agreements are covenants real and, as such, run with the land and that any owner of a plot covered by the agreement may pass the benefit there of to his or her grantee, no "assignment" as claimed by the defendants is necessary to that end. The passage of title such as by deed, probate devolution or by other court decree is sufficient.
We turn focally to the issue of what is to be the measure of damages in these cases. The opposing parties are in contention here and have briefed this issue extensively. The plaintiffs maintain that damages should be measured by principles of contract law, that to do so is in harmony with Judge Gormley's ruling on summary judgment that the contracts were breached and that to use this standard is in accord with Connecticut case law as well as with equitable and public policy considerations. The plaintiffs, characterizing the defendants' claim here as to the measure of damages to be used as being "a hybrid of contract and condemnation CT Page 5278 law", say that while contract law should control, yet "the proper application of condemnation damages would lead to the same amount of damages." i.e. to put the plaintiffs back in the same position as if the breach or "taking" never occurred. They, however argue strongly that the defendants' methodology misconstrues condemnation case law and violates common sense "as well as ignoring the fact that the defendant unilaterally breached the contracts rather than employ their eminent domain powers and that the defendants should not be permitted "to convert their intentional breach of contract into a quasi-condemnation proceeding which is without support in fact or law." Continuing, the plaintiff's claim that putting them back in their original position and making them "whole again" entails compensating them for the value of the agreements over the remaining sixty odd years of these contracts discounted to present value. Accordingly, the value of the agreements, the plaintiffs claim is the "savings" each landowner receives from having to pay only $15. per year for sewer use fees rather than the higher current sewer use multiplied by the remaining years of each contract discounted to present value. This court, therefore, according to the plaintiffs should treat the issue of damages "as damages flowing from a contractual breach" regardless of whether this is viewed as a breach of contract or a de facto taking. The plaintiffs, however, assert that they are entitled to damages based in a contractual measure of damages "even if these cases are considered condemnation of a real property interest as just compensation, in a condemnation setting can be determined by a prior agreement." They advance three reasons whey this court should adopt this approach: (1) the "breach of similar agreements, based on similar facts have been treated by other courts as a breach of contract and they cite decisions[3] claimed to sustain this position; (2) the measure of damages adopted by this court should be harmonized with Judge Gormley's memorandum of decision where "it is clear that that court (Gormley, J.) viewed the Town's action in violating the agreement as first and foremost a breach of contact" and (3) the Town never condemned the property interest in question but rather acted to deprive the class of its constitutional rights by initially billing class members in derogation of the agreement without a hearing and then declaring the agreements null and void at a PUC hearing when the PUC had no authority to do so. It would thus be inequitable, argue the plaintiffs for the Town to force its "strained concept" of damages upon class members when it chose not to follow well established condemnation procedures at the outset.[4]
In addition, the plaintiffs urge the adoption the views of their economic expert, Dr. Gary Crakes. In that regard the plaintiffs point out that the evidence of Dr. Arthur Wright, a defendant's expert, substantially concurred with Dr. Crakes' analysis. As to the testimony of Philip Ball and Robert Parente, CT Page 5279 two of the defendants' experts, the plaintiffs, while observing that their methodology was "very much like the approach" used by Crakes and Wright, they stress the critical exception that Ball and Parente made to such evidence by capping or restricting the remaining years to run on the plaintiffs' agreements for the purpose of damages to "the range of 7 to 15 years based on national surveys and statistics regarding the average length of time a homeowner resided in one location" as well as arguing that the defendant offered no case law or other basis in support of that position.
The defendants, on the other hand, claim that the appropriate measure of damages is an assessment of damages based on the law of eminent domain and the condemnation of property. Asserting that the plaintiffs, as well as the court (Gormley, J.) "agreed" that the Town's actions constituted a de facto taking of property, they point out that our state constitution requires the payment of just compensation for the taking of every right or interest in property that has market value. Observing that even where there has been no formal condemnation and there was none in either of these two cases, the taking of property in fact is considered an "inverse condemnation and just compensation is the appropriate remedy for a regulatory taking."[5] An owner's damages are calculated as of the time of taking, they maintain, and not the owner at the time the action is commenced. Moreover, arguing that if the parcel of land from which the taking is made changes hands after the taking but before compensation has been paid the right to receive the compensation, the defendants assert, does not run with the land as that was a personal claim of the owner at the time of taking. They say that a transfer of the right to compensation can only be made by a "separate assignment" of this right. Similarly, they claim that at common law the breach of a covenant running with the land was considered to be a non-assignable chose in action but they acknowledge that under modern rules rights of action arising from a breach of contract are assignable. They go on to point out that all five real estate appraisers produced by the Town agreed that the caps in the covenants in these cases had no market value which could be used to assess damages to the plaintiffs' properties under the "before and after rule". Contending that the plaintiffs presented no countervailing evidence to this rule, the defendants conclude that under the "before and after rule" a judgment for nominal damages should enter because compensation need only be paid for the taking of a property interest with value. But conceding that our cases have recognized that "the issue of just compensation is an equitable one rather than a strictly legal or technical determination, "the defendants then argue that our case law supports a general rule that is applicable to condemnation cases, i.e. just compensation may be measured by the "fair equivalent in money for the property taken, as nearly as it nature will permit." Although this "fair equivalent in money" CT Page 5280 is usually the market value, "a primary concern", the defendants then argue, "is that the condemnee be placed in as good a condition pecuniarily by just compensation as he would have been in had the property not been taken." Continuing, they maintain that the trial court in determining just compensation has the discretion to select the method of valuation most appropriate to the case before it. In thus urging this alternative method for evaluating the sewer use charge caps other than the "usual before and after rule", the defendants strongly claim that the only "appropriate and equitable method of compensation" would limit compensation to the probable duration of the plaintiffs ownership because, they say, "the recipient of the compensation is the class member not the property" and that permitting the plaintiffs to receive compensation beyond the probable duration of their ownership would be allowing them a windfall. In any event, such a view as they espouse must consider, they go on, that the town has taken only a partial property interest in extinguishing the covenant, it has not impaired or taken any of the physical characteristics of their property, it has not taken the plaintiff's benefit under the covenant to have their sewage discharged and treated by its municipal sewage system and that the plaintiffs will benefit from the installation of the town's expanded waste water treatment facility. Consequently, the defendants claim, that if any benefits affect the market value of the plaintiffs' property, any such benefit must be deducted from any amount of damages.
To further support their position the defendants urge the alternative method for valuing the sewer use caps which was formulated by their experts Ball and Parente. Although the data of both these experts real estate appraisers did not support damages under the usual "before and after rule" they both believed the caps had some value. As a result, each approached the valuation problem with an economic analysis which considered inter alia water use, sewer use rates, probable duration of ownership of properties, the difference between the $15. cap and the uncapped sewer use charge and the present value of the extinguished sewer use cap. This approach, the defendants say, would not only fall within the general rule for just compensation in condemnation cases; but it is also equitable and gives the plaintiffs "just compensation". In urging that this court reject what they call a strict legal breach of contract measure of damages, the defendants argue that the plaintiffs' claim that they should be reimbursed for their "lost savings" for the full balance of the 99 years in their covenants incorrectly assumes that current owners and members of the class will remain owners for the duration of the 99 year term.
The plaintiffs as noted, argue that their damages should be computed as those flowing from a breach of contract pointing out CT Page 5281 that this is in harmony with Judge Gormley's ruling in summary judgment. In doing so they attack the "hybrid of contract and condemnation law" they claim that defendants would use even though the plaintiffs seem to argue that even with the application of condemnation law the result would damage-wise, be the same, i.e. putting the plaintiffs back in the same position as if the breach of contract or "taking" had never occurred. The defendants argue that Judge Gormley "agreed" that the Town's action constituted a de facto taking. The defendants claim that such a taking should be considered an "inverse condemnation and that just compensation is "the appropriate remedy for a regulatory taking in an inverse condemnation action."
"The construction of a judgment is a question of law for the court . . . . The determinative factor [in construing a judgment] is the intention of the court as gathered from all parts of the judgment . . . . The interpretation of a judgment may involve the circumstances surrounding the making of the judgment. . . . `Effect must be given to that which is clearly implied as well as to that which is expressed.' . . . The judgment should admit of a consistent construction as a whole. . ." Lashgari v. Lashgari, 197 Conn. 189,196-197, 496 A.2d 491 (1985). The court (Gormley, J.) initially granted summary judgment for the plaintiffs on the third count and on the fourth count (which is in breach of contract). Thereafter, in its memorandum it said: "in addition, (it) granted summary judgment upon (the) claim that the action of the defendant constituted an improper and unconstitutional taking of the plaintiff's property rights." The court (Gormley, J.) concluded that the complaint "does in fact allege that the defendant's actions constituted a taking of a valuable property right. Although the court need not determine this issue in light of its decision with reference to the breach of contract issue, it provides further support for the validity of the plaintiff's position." This court reads Judge Gormley's memorandum of decision as not only granting summary judgment on the third and fourth counts but also as doing so on the plaintiff's claim of "an improper and unconstitutional taking." As to the latter, however, it does not adopt the defendant's statement that it was a "regulatory taking" for which it cites no authority.
The issue of that measure of damages to be applied by the court in these cases point up the differences between the parties as to the amount of compensatory damages that may potentially be awarded. Dr. Crakes was the plaintiffs' expert economist who testified on the amount of damages computed for the remaining years in each agreement and then discounted to present value. Assuming a class membership of 335 households, a 12,000 cubic foot annual water usage[6] and a net 2% discount rate his computation from June 1, 1990 for the years remaining on the four agreements yielded total damages in the amount of $2,588, 616.00. In addition CT Page 5282 to this sum, Dr. Crakes computed what he called the "actual lost; savings" for the 335 members of the class for the period from the voiding of contracts by the PUC on February 3, 1987 to June 1, 1990 to be $209,978.00. The total of these figures, i.e. $2,798,594.00 the plaintiffs submit is "the absolute minimum compensation to which they are entitled as a result of the Town's breach of the four agreements." In support of this position the plaintiffs point to the evidence of Dr. Wright, an expert economist, produced by the defendants, who did say that "Dr. Crakes' basic methodology is sound. . ." but also said that he differed with him in some respects. Dr. Wright, also using the same cubic foot usage figure but using a higher discount rate of 2.148%, for the remaining years in each agreement arrived at a total damage figure of $2,512,625.00. Assuming a 335 class membership then Dr. Crakes' figure averages out to $8,354.01 per class member while Dr. Wright's figure in that regard would average $7,500.37 per class member. This figure of $7,500.37 does not, however, consider any damages for any class member for the period from February 3, 1987 to June 1, 1990. Dr. Wright, unlike Dr. Crakes, did not make any computation of the plaintiffs "actual lost savings" for the period from February 3, 1987 to June 1, 1990 for which Dr. Crakes' computation totaled $209,978.00. The plaintiffs' claim that Dr. Wright's computation contributes to the credibility of those of Dr. Crakes insofar as Wright's testimony of the value of the agreement: from June 1, 1990 to their expiration.
The defendants, however, do not, of course, rely in their measure of damages claim on the figures of Dr. Wright but basically rather upon those their experts Ball and Parente, both very competent and experienced real estate appraisers. Parente testified, as did the defendants' other real estate experts, that the sewer use caps had no market value. Parente, however, did for the purpose of assessing damages for the town's abrogating the $15. sewer cap use what the defendants have variously called an economic analysis or an annuity approach. Parente said that it would be unreasonable and inequitable to award the plaintiffs, as the present owners, the entire value of the sewer use agreements because they would either not hold title to the property or live for the next 62 to 64 years, the approximate remainder of the 99 year term in these agreements. Rather his methodology involved his utilizing turnover (of the property) rates. Based on exhaustive analysis of sales data from the units in all four agreements and other areas in Wallingford, national turnover rates and other criteria he believed that the appropriate turnover rate for the plaintiffs' properties in the two classes in these cases would be twelve years (which he said was also the average turnover rate for Connecticut as well as the country.) The turnover rates for the properties covered by the four agreements going back to 1980 was fifteen years[7] but Parente said that the twelve year CT Page 5283 figure based on sales in 1984-1986 would be more indicative of the appropriate turnover rate. In arriving at his opinion he also utilized sewer charge figures based on the 12,000 cubic foot water use and actual PUC sewer use rates for 1987-1991. For the period of 1991-2001 he projected sewer charges based on a 4.75% annual increase (the same increase used by Dr. Wright). In discounting his figure to present value, Parente used a 10% discount rate and he explained why he did so. Parente then rendered his opinion that for a twelve year holding period his valuation methodology would yield total damages in the amount of $465,650.00 for 335 properties.
Mr. Ball's valuation methodology considered the average holding period of the property owners to be seven years. He had determined upon a "pure economic basis" in approaching the value issue because he could not prove that the $15. sewer use caps had any "statistically significant value" by using the market data and "before and after" value approach. Ball said that he could not come up with an "verifiable number" to support a "before and after" analysis. He did not believe that the new sewer treatment plant which was the subject of the federal and state grants involved was enough of a benefit to the plaintiff to extinguish entirely the value to them of the sewer use caps because every other Wallingford resident got the benefit of this new plant without having to give up a sewer use cap but the plaintiffs were the only ones required to do so. So he determined to proceed on a pure economic basis as he still felt that the plaintiffs had lost something of value. Ball indicated that at the time he analyzed this issue in July 1987 he had not anticipated the real estate crash that took place later in 1987. He, nevertheless, still felt that it was appropriate to use a seven year holding period. He determined the cost differential rate between the uncapped sewer use rate and the cap of $15. under the four agreements. Going on he used rates charged by the Wallingford PUC for 1987-1990 and, 1991-1993, and for the balance of the seven year holding period he projected a 4% increase in the sewer use rate. He then discounted this seven year "flow" to get his present value and he did so by applying the "safe rate" of 7%. As he proceeded in his methodology and employing actual water use figures, Ball observed that the "vaste (sic) majority of the present value of the seven- year difference in the capped and uncapped sewer use charges ranges from approximately $700. to approximately $1,000. per parcel." To put his analysis into perspective Ball then randomly selected three properties, which represented, in his opinion, moderate, low and high water use, utilizing these for his projected seven year period, his methodology yielded figures of $896.90, $462.34 and $1,517.39. Fairness requires point out that Ball felt that, when pressed upon cross-examination, using a twelve year holding period was somewhat high, that he would be more comfortable with a ten year period rather than seven or CT Page 5284 twelve. He, however, would not be "comfortable" with a twenty year holding period at 8%. Ball felt that to compensate the plaintiffs for the remaining approximately sixty years of this agreement would be giving them a "windfall." Significantly, Ball, when asked what happens to the fifty-odd years remaining under the terms of these agreement given his seven year analysis, candidly said "I honestly don't know."
A brief comment should be made about the defendants' claim that to award the class members damages for the years remaining on the four agreements should be giving them a "windfall". That term has been said to mean "an unexpected or sudden gain or advantage." Webster's Third New International Dictionary. It is more reasonable to suggest that perhaps it is the defendants who may have received the windfall if any there be. The null and void declaration of February 3, 1987 of the agreements removed a serious "impediment" to the federal sewer grant. The claim of the defendants as to the compensatory damages to be awarded class members by accepting their expert appraisers seven or twelve or even fifteen year turnover economic analysis measure of compensation overlooks the fact that to do so would seriously and unfairly limit their compensatory damages when the defendants are the ones who unilaterally abrogated these agreements. Moreover, and significantly, the Town, having done this, would be receiving for the many remaining years of the agreements greatly increased revenues in excess of the $15. sewer use cap from class members from which they were heretofore barred by the agreements undertaken years ago.
We have already determined that when the agreements were executed the parties intended the covenants to be legally valid for 99 years; that the promised and expected performance would be forthcoming for that entire period. No question was raised as to their validity on their execution and that for almost thirty-five years the Town recognized this until the null and void declaration of February 3, 1987. The defendants now maintain that to compensate the plaintiffs for that period would be inter alia unreasonable, inequitable and result in a windfall. By arguing on a purely economic basis the defendants would in the face of these four contractual agreements, now cut back drastically on any award of compensatory damages from this contractual term, unilaterally abrogated by them, to a term far less than originally agreed to. They advance no legal persuasive authority for that position.
We speak to the goal of compensation keeping in mind that "it is an accepted principle of law that in all litigation of whatever kind the law seeks to compensate for the wrongs complained of so as to restore the injured party to his former status." Ench v. Bluestein, 52 N.J. Super. 169, 145, A.2d 44, 46 (1958). "`Damages' is a word of art with a rather definite meaning. It is something CT Page 5285 paid in recompense for an infringement of a plaintiff's legal right by the defendant's liability creating conduct." Miller v. Weller, 288 F.2d 438, 439 (3d Cir. 1961), cert. den. 368 U.S. 829,82 S.Ct. 51, 7 L.Ed.2d 32 (1961). In damages, "the cardinal rule is that a person shall receive fair compensation for his loss or injury and no more. Baldwin v. Porter, 12 Conn. 473." Barker v. Lewis Storage Transfer Co., 78 Conn. 198, 200, 61. A 363 (1905) (emphasis added), 1 Sutherland, Damages (4th Ed.) 12-, p. 47. This is in keeping with the view that "the awarding of damages is to reimburse not to enrich." Gliddin Co. v. Hellen Lines, 207 F. Sup. 262, 270 (SDNY (1962)).
The defendants maintain that it is not reasonable to have a measure of damages that permits the plaintiffs to recover for the balance of the term for the injury done them. "`Reasonable' is a relative term which varies in the context in which it is used, and its meaning may be affected by the facts of the particular controversy. 36 Words Phrases (1959 Sup). It is also synonymous with `(e)quitable, fair, just', Webster, New International Dictionary (2d Ed); . . ." E. M. Loew's Enterprises Inc. v. Surabian, 146 Conn. 608, 612, 153 A.2d (463 (1959)). Pertinently, when "reasonable" has been employed to describe the means which are used to achieve some legitimate end (such as the goal of compensatory damages) it suggests not necessarily the best or the only method, but that one fairly appropriate under all the circumstances. See 75 C.J.S. p. 635. Under the circumstances of this case this court concludes that the measure of damages as contended for by the plaintiffs should be the measure utilized; it is not at all unreasonable or inequitable or unjust. Nor does it accord the plaintiffs a windfall, it proposes to award to the plaintiffs the present dollar value of the performance promised and fairly contemplated but denied to them by the defendants — no more and no less. No explanation that was "reasonable" or "equitable" was given by any expert of the defendants or any of their witnesses as to what happens under their theory of damages compensation-wise to the balance of term of the agreements beyond their turnover period analysis. The defendant's statement, in defense of restricting the plaintiffs' damages to average turnover period seven (or even twelve) years because the covenants in question attaches personally to the owner and not to the land is a claim with no authority cited for it. In addition, it also overlooks the contractual commitment made embodying this covenant which legally runs with the land and not the particular owner.
Our Supreme Court has said that "in an action for breach of contract, the general rule is that the award of damages is designed to place the injured party, so far as can be done by money, in the same position as that he would have been in had the contract been performed." Lar-Rob Bus Corporation v. Fairfield,170 Conn. 397, 405, 448 A.2d 812 (1976); O'Hara v. State, 218 Conn. 628, CT Page 5286 642, A.2d (1991); Loda v. H.K. Sargeant Associates, Inc., 188 Conn. 69, 81, 448 A.2d 812 (1988); Bachman v. Fortuna,145 Conn. 191, 195, 141 A.2d 1477 (1958); Beliste v. Berkshire Ice Co. 98 Conn. 689, 700, 120 A. 599 (1923); McCormick, Damages, 137.
While there is no unbending rule as to the evidence by which such compensation is to be determined "the object of the parties ought to be attained as nearly as possible; and that is, that the specific act agreed to be done should be performed. If the, party omits to do what he stipulated, it is just, as a reasonable substitute, that he should pay the precise value for the thing which he contracted to do; and such value to be estimated at the time when the act in question should have been executed." Lee v. Haris, 85 Conn. 212, 214, 82 A. 186 (1912) quoting Wells v. Abernethy, 5 Conn. 222, 227 (1824). "In the law of Contract, the term `damages' is used to mean compensation in money as a substitute for and the equivalent of the promised performances." 5 Corbin on contracts 990. Damages are to be measured as of the date of the breach. O'Hara v. State, supra; Kevin Roche-John Dinkloo Associates v. New Haven, 205 Conn. 741, 749,535 A.2d 1287 (1988). The court adopts the position of the plaintiffs' as to the measure of damages to be used as well as the views of the plaintiffs' expert economist, Dr. Crakes including his opinion of damages in the amount of $2,798,594.00.
Accordingly, the court concludes on this branch of the cases that the 335 class members whose households are involved in these two cases are awarded $2,798,594.00 in compensatory damages for such damages as computed by Dr. Crakes from February 3, 1987 prospectively for the balance of all the years remaining on each of the four agreements (Westview Kingsland, Norshap and Rosewood) discounted to present value. The amount $2,798,594.00 is arrived at by taking Dr. Crakes' minimum figure of $2,588,616.00 which was completed from June 1, 1990 prospectively for the balance of all the years remaining on each of these four agreements and discounted to present value and adding to that figure the amount of $209,978.00 to arrive at $2,798, 594.00. The figure of $209,978.00 was the amount Dr. Crakes computed to be the "actual lost savings" for the time from February 3, 1987, the date of the declaration as null and void of these agreement by the defendant PUC until June 1, 1990. As already noted, the defendants adduced no evidence of the amount of any compensatory damages that might result to the plaintiffs for the period from February 3, 1987 to June 1, 1990.
In adopting Dr. Crakes' position as to the total damages of $2,798,594.00 resulting to the 335 plaintiffs under his 2% discount 12,000 cubic feet water usage approach two comments should be made. First, the figure of $2,798,594.00 does not CT Page 5287 resolve the issue of damages in the Renfrew case of the 63 class members in that case who claimed to have been billed, prior to February 3, 1987, for sewer water use rates in excess of the $15. sewer use cap that attaches to their individual properties. That is taken up later in this opinion. At this point we decide only the compensatory damages of the Renfrew class members and Braithwaite class members from February 3, 1987 prospectively over the remaining years on their agreements. Second, the figure of 335 class members (or households) does not include any opt-outs which may be disclosed by the record in these cases so that the figure of $2,798,594.00 must be adjusted downwards to account for those opt-outs disclosed by the records in these two class action cases.
The court, therefore, concludes that on this branch of the case each of the 335 class members in Braithwaite and Renfrew is awarded $8,354.01 in compensatory damages covering the period from February 3, 1987 forward for the balance of the on each of the four agreements. The total award of $2,798,594.00 will be diminished by $8,354.01 for each opt-out the record discloses.
The plaintiffs also claim entitlement to an award of punitive damages for the reasons set out below. The defendants contend that they are not entitled to any such award essentially for two reasons. The first ground is that the plaintiffs did not properly notify counsel or the court of their claim in that they failed to allege that the Town had acted willfully, maliciously or with reckless indifference to the rights of the plaintiffs as they must and also that they did not allege "tortious conduct on the part of the Town such as to justify punitive damages under a breach of contract theory of recovery." The second ground is the defendants' claim that the evidence adduced at trial does not support an award of punitive damages in the instant actions.
As to the first ground of objection the court recognizes that it has been said "exemplary damages (punitive damages), as an extraordinary remedy, require delineation within the pleadings of wanton or wilful misconduct; Nair v. Thaw, 156 Conn. 445, 452-453,242 A.2d 757 (1968); Triangle Sheet Metal Works Inc. v. Silver,154 Conn. 116, 118, 222 A.2d 220 (1966); as well as evidence showing such intentional and wilful misconduct. . . ." "Punitive Damages" and Exemplary Damages" are merely alternate labels for the same remedy. Alaimo v. Royer, 188 Conn. 36, 42, 448 A.2d 207
(1982); Manning v. Michael, 188 Conn. 607, 619, 452 A.2d 1157
(1982). The prayers for relief in the original complaints in both Braithwaite and Renfrew claim punitive damages. The sixth count of the Renfrew complaint which alleges fraudulent conduct by the defendants in charging and collecting certain payments in excess of the $15. cap for some years from some Renfrew class members has the flavor of an allegation of such conduct. In any event while CT Page 5288 the counts upon which summary judgment was granted do not explicitly contain allegations ordinarily used in describing the conduct associated with punitive damages it seems to the court that the issue is here and should be decided. The plaintiffs claim that the actions of the defendants were such as to justify an award. The sixth count of the Renfrew complaint specifically claims fraudulent conduct. The defendants' alleged conduct leading up to the null and void declaration of February 3, 1987 strongly suggest, according to the plaintiffs', conduct that justify punitive damages. "Punitive damages need not be explicitly alleged in the body of the complaint or included in the claims for relief [such relief was so claimed here] so long as the plaintiff's pleading give the defendant sufficient notice that "[it is being so charged]" Seymour v. Carcia, 24 Conn. App. 496, 451, A.2d (1991). Materials elicited by extensive pre-trial discovery came in at trial on this issue. The evidence the plaintiffs claimed went to punitive damages cannot fairly be said to have caught the defendants off guard. In any event, while much of it was objected to, there was no request for any continuances on the ground of surprise. We have decided to take up that claim.
Now we set out the essential claims of the plaintiffs on this issue and the evidence they refer to and then the claims of the defendants concerning the evidence on the issue. In resolving this issue, the court was presented with questions of credibility. As with expert witnesses, the trier of fact is also the judge of the credibility of lay witnesses. Blake v. Blake, 207 Conn. 217,225, 541 A.2d (1201 (1988)); In re Robert H., 199 Conn. 693, 712,509 A.2d 475 (1986). Implicit in this rubric is that where the evidence is in conflict, its probative force is for the trier of fact to determine. Bowman v. 1477 Central Avenue Apartments, Inc., 203 Conn. 246, 257, 524 A.2d 610 (1987).
Under Connecticut Law, punitive damages are recognized in cases of tort. Collens v. New Canaan Water Co., 155 Conn. 477,459-489, 234 A.2d 825 (1967). No Connecticut case law has been cited to the court that such damages may be awarded in a breach of contract. Our Appellate Court, however, has indicated that "breach of contract founded on tortious conduct may allow the award of punitive damages." L.F. Pace Sons, Inc. v. Travelers Indemnity Co., 9 Conn. App. 30, 48, 514 A.2d 766, cert denied201 Conn. 811, 516 A.2d 886 (1988). "In order to award punitive or exemplary damages, evidence must reveal reckless indifference to the rights of others or an intentional or wanton violation of those rights." Venturi v. Savitt Inc., 191 Conn. 588, 592,468 A.2d 933 (1983); see Collens v. New Canaan Water Co., supra; Vandersluis v. Weil, 176 Conn. 353, 358, 407 A.2d 982 (1978). "In fact, the flavor of the basic requirement to justify an award of punitive damages is described in terms of wanton and malicious injury, evil motion and violence. Triangle Sheet Metal Works, CT Page 5289 Inc. v. Silver, 154 Conn. 116, 128, 222 A.2d 220 (1966)." Venturi v. Savitt Inc., supra; Manning v. Michael, 188 Conn. 607, 619,452 A.2d 1157 (1982).
In asserting this entitlement to punitive damages, the plaintiffs argue that the evidence introduced at trial indicates that the defendants operated with a reckless indifference to the rights of the plaintiff classes and in intentional violation their rights. They argue that they deserve such damages in the amount of their attorneys' fees because they were forced into this litigation as a result of the "fraudulent actions" of the defendants.
The plaintiffs refer to certain evidence which they maintain supports their position. This includes: A 1967 letter from Attorney Stephen Sachner to the defendant's Water and Sewer Department on behalf of a resident pointing out what he states is an overbilling of his client over the $15. sewer use cap in violation of the covenant and requesting an adjustment for that. The evidence, we note, did not indicate the resolution of that dispute. A 1965 letter from, William H. Regan, assistant Town attorney of Wallingford to Matthew Galligan, then Wallingford Town Attorney, indicating the former's desire to discuss with the latter an earlier 1965 letter from a Mr. McDivitt pertaining to the sewer use charge in the Westview Hills project. Indicating that he anticipated that, in doing title searches on this project "that some day this question would arise", Regan stated that he believed that under the 1957 Special Act the Town had to adhere to the agreement. In 1968 John Gallagher, the then Wallingford Director of Public Utilities, wrote to Attorney Gailigan, referring inter alia, to a 1958 letter from Attorney Galligan which Gallagher said indicated that Attorney Galligan stated that "only by Court judgment pursuant to Declaratory Judgment action will the validity of the contract be properly determined." This same letter from Gallagher also referred to another letter (between Attorney Robert Billings as attorney for the Sewer Authority and one Erwin Baldwin) that was said to have stated that Attorney Galligan "as previous counsel to the Authority had indicated that the sewer board is bound to the requirements of the contract." Gallagher's 1968 letter continued, stating that it was his "opinion" that "in view of the opinions rendered by you (Attorney Galligan) and Mr. Regan, that the validity of the contract can only be properly determined by court judgment pursuant to a declaratory judgment action and that the Town of Wallingford has a definite obligation to initiate the aforesaid action." Gallagher then said that the PUC Chairman had authorized him (Gallagher) "to request Galligan to proceed to institute court action to determine the legality of this contract by a declaratory judgment" and that "this action should be initiated immediately." CT Page 5290
Attorney Galligan did testify at the hearing before this court. He said that he was aware of the sewer use agreements when he was town attorney and before that. Moreover, he said that as town attorney he did not bring a legal action to determine the validity of the agreements and that if the mayor had asked him to bring such a suit he would recall that. With reference to this; Galligan pointed out that to institute litigation the permission of the Town Council as well as the Mayor was necessary. Galligan, who last served as either Town Attorney or as Attorney for the Town Sewer authority in 1969, also testified that he did not recall while serving in either capacity of telling town authorities that the sewer caps in the covenant should be disregarded.
The plaintiffs next refer to a letter some ten years later dated June 4, 1979 written by Attorney Robert E. Regan, then Wallingford Assistant Town Attorney to the Federal Department of Environmental Protection in Boston which enclosed a copy of the Westview Hills agreement. In that letter Attorney Regan outlined the background of this agreement indicating the 99 year term for the $15. sewer use cap and pointed out that the Town had in the past entered similar agreements. Further, he said that it had come to the attention of the Wallingford PUC that "an agreement of this type might jeopardize Federal grants for the construction of sewer treatment facilities in that the yearly charge of $15.00 per family unit . . . with not be equivalent to the proportionate share of the cost of operation and maintenance of the treatment facilities within the town of Wallingford." Opining that in trying to void these agreements by court proceedings "a Judge would be hard-pressed to make a favorable decision allowing the Town to terminate these agreements" and considering the monetary cost and involvement of time and delay in court action, Regan said that the PUC would like a determination from the Federal Department of Environmental Protection whether an exception could be made allowing the agreements to remain in effect in Wallingford in order that Federal grants will not be jeopardized. In September 1979, this Federal agency wrote Attorney Regan advising that the EPA could make no grant unless the grantee "develops a system of charges which insures that each recipient of waste treatment pays its proportionate share of the costs of waste treatment services provided by the grantee. . ." as required by the Federal Clean Water Act. Pointing out that the Federal EPA has no authority to modify statutory requirements, no waiver could be given and if the town wanted grants under their program, "these impediments to the formulation of an approvable use charge system must be eliminated."
Several years later in May 1984, General Farrell, Assistant Town Attorney wrote Raymond Smith, the Wallingford PUC Director concerning the agreements including one with the Masonic Home in CT Page 5291 Wallingford as to possible courses of action. One course he mentioned, "would be a lawsuit involving millions of dollars" in hopes "of relieving us from these agreements." Farrell, however, opined that before approval for such a suit was obtained and that even before thinking of such a suit a legal opinion from an expert on "constitutional or contract law should be obtained."
Next, the plaintiffs refer to an notice entitled "Sewer Use Rate" on the stationery of the Wallingford Mayor's Office, dated March 26, 1985, over Mayor Dickinson's signature and addressed "To Whom It May Concern". This notice states that "The (Wallingford) Pollution Control Authority intends to establish a sewer use charge to adequately fund the Sewer Division Operation" and "the charge shall be such that all uses will pay the same rate." Parenthetically, the plaintiffs point to no credible evidence as to whom this "To Whom It May Concern" notice was ever sent or noticed but do argue in their brief that in March 1985 they were never informed of the Town's intent to charge class members the "same rate" as all other sewer uses in Wallingford. It, however, deserves referencing that, according to one of the plaintiffs' exhibits, which is a copy of a resolution approved on March 26, 1985[8] the Town Council, the Town's legislative body, at a meeting on that date, gave authority to Mayor Dickinson to apply for, furnish any needed information, execute necessary documents, etc. that may be necessary to apply for with the Federal government and the like for a grant to aid in the construction of publicly owned treatment works. This resolution also authorized the mayor to execute and file with the Connecticut Department of Environmental Protection pursuant to statute such applications, documents, etc. necessary for state grants for the expansion and improvement to waste water treatment facilities.
Continuing their argument for punitive damages the plaintiff argues that Attorney Farrell, former PUC Commissioner Richard Nunn and Mayor Dickinson all testified that the Town had solicited a legal opinion concerning the validity of the agreements from one Attorney Norbert Church and that the decision to bill the plaintiffs in "abrogation" of the agreement was based on Church's opinion. The plaintiffs then contend that the Mayor's "To Whom It May Concern" notice of March 26, 1985" certainly indicates that the Town had fully intended to take a "hostile position" toward "honoring the Agreements well before Attorney Church's opinion was delivered to the Mayor and the PUC in February 1987." This is in sharp contrast, they agree to the "radically different approach" with the Masonic Charity Foundation of Connecticut which was a party to a "similar contract" which was an "impediment" to the same federal sewer grant. There, the plaintiffs refer to their exhibit QQ which was an agreement and stipulation of settlement between Town and Masonic Charity Foundation dated February 4, 1987 which was the day after the PUC declared the agreements null and CT Page 5292 void. Going on, they contend while the Town dealt "honorably" with the Masonic home "and brought its agreement" it did not approach the plaintiffs or even given them notice of its intent to bill in excess of the contracts, and that shows a reckless indifference to the rights of the plaintiffs and an intentional violation of those rights.
Attention is also called by the plaintiffs to a June 17, 1987 televised interview with Mayor Dickinson on a program called "Focus on the Mayor." A videotape of this 22 minute interview was played for this court. Among other things, it indicated that the Mayor was concerned about Wallingford's position on a priority list with other communities in its application for the federal sewer grant involved. During that interview the Mayor indicated both federal and state officials were aware that the town had some questions about the agreements, that both state and federal authorities needed representation that everyone would be charged the same sewer use rate and that the Town would have to be ready to move ahead without such questions once the granting authorities were ready to move. The Mayor also commented at that time that Wallingford was the last town to get a grant (thereafter such matters become the subject of a loan and not a grant). As impacting on their punitive damages claim, the plaintiffs say these comments "are an indication of the Town's motivation in deciding not to give the plaintiffs notice of its intent to abrogate the contracts in deciding not to seek a declaratory judgment regarding the validity of the contracts, and in deciding not to pursue a condemnation of the Agreements." In addition, the plaintiffs argue that the testimony of Raymond Denison, the office manager of the Water and Sewer Division of the PUC and Richard Nunn indicated that the decision to increase the sewer use rates for the neighborhoods where the plaintiffs homes are located was made by the PUC in December 1985 although they did not go into effect until November 1986. Again it is noted parenthetically that this action setting the town-wide rates in December 1985 was in accordance with the legal requirement that rates for the whole Town be sent in advance and after a public hearing. The plaintiffs also maintain that certain class members, who actually inquired were not only told that the agreement were invalid but were allegedly told that Commissioner Nunn said they might be back-billed for amounts in excess of the $15. cap. Some class members, there is no evidence of how many, have had liens placed on their properties for their failure to pay bills charged in excess of $15, and there was testimony that such liens have affected the credit of two class members. It is essentially for such conduct by the defendants as outlined above that the plaintiffs maintain that punitive damages should be awarded.
In responding, the defendants claim that the evidence at the trial does not support an award of punitive damages in these CT Page 5293 cases. There, they argue inter alia; that there was no proof of any motivating interest or design on their part to harm the plaintiffs by their conduct, that they acted in good faith and relied on legal advice in deciding to increase the plaintiffs' sewer bills and declare the sewer use covenants null and void. They maintain that, prior to declaring the covenants null and void in 1987, they sought waivers from the EPA, considered various courses of conduct and that the decision to nullify the covenants was not only made based on legal advice but made in good faith for the benefit of the entire town as opposed to a decision to intentionally violate the plaintiffs' rights. Moreover, it is contended that the Mayor, the Town or the PUC did not commit any "fraudulent or tortuous acts" with regard to the plaintiffs' sewer use caps as the plaintiffs suggest. The actions of the defendants, accordingly, do not amount, they claim, to a malicious or evil intent on the part of the town to harm the plaintiffs. The defendants, therefore, vigorously contend that punitive damages cannot be awarded as the plaintiffs have not proven entitlement to such an award.
It is appropriate here to advert to several other legal principles involved in the issue of punitive damages in these cases. The plaintiffs make serious claims against the actions of certain public officers of the Town such as the Mayor, town attorneys, and PUC members. There is a presumption that a public officer properly performs his duty and acted legally and properly unless the contrary is proven. Bowman v. 1977 Central Avenue Apartment Inc., supra 225, supra 22; Cahill v. Board of Education,198 Conn. 229, 243, 502 A.2d 490 (1985) Murach v. Planning 
Zoning Commission, 196 Conn. 192, 196, 198, 491 A.2d 1058 (1985). Balch v. Commissioner of Motor Vehicles, 165 Conn. 559, 568,345 A.2d 520 (1973); Antiean, Municipal Corporation Law 22.38. A deputy corporation counsel, as well as a corporation counsel is a public officer. See Bredice v. Norwalk, 152 Conn. 287, 294,206 A.2d 433 (1964). As a general rule, a city or town attorney has the same power with regard to that municipality as a private attorney has with regard to a private client. See generally 64 C.J.S. Municipal corporations 2206, 56 Am.Jur.2d Municipal Corporations, 282 and one of those duties is to act as legal advisor to city officers, boards, commissioners and departments. See 2 Yokely, Municipal Corporation 241. It is not at all overlooked that municipal contracts are measured by the same tests and subject to the same rights and liabilities as other contracts. 10 McQuillan, Municipal Corporations, 29.1241, see Leventhal v. Stratford, 121 Conn. 290, 187 A. 587 (1936). It is apparent, however, that where punitive damages are sought, the elements to be proven, as indicated above are clearly not those necessary in an action for compensatory damages for the breach of contract itself. CT Page 5294
The plaintiffs' scenario reaches from a 1968 letter referred to above back to a 1958 opinion attributed to Attorney Galligan that he had indicated that the town was bound to the requirements of the contract. It refers to a 1965 letter from Regan to Galligan referred to above that the Town, Regan believed, had to adhere to the agreement under the 1957 special act. Reference was also made to Attorney's Sachner's 1967 letter.
It must be remembered even assuming some town officials were aware of the problem that Galligan testified and there is no contrary evidence that while town counsel did not start any court action concerning these agreements to determine the validity of these agreements, litigation could not be undertaken unless the Mayor and the Town Council agreed to its institution. There is no competent evidence at all in these cases that the Mayor and the Town Council were ever asked to authorize it. It is not the defendant's burden to disprove this but it was that of the plaintiffs to prove it. This hardly advances the plaintiffs' malicious motivation, reckless indifference, etc. arguments for that portion of the punitive damages tapestry.
Other than present town counsel, Galligan was the only live witness in the town counsel context that testified to that insofar as the 1950's and 1960's are concerned. In any event, Galligan also testified that had the Mayor (whoever that might been back in the 1950's or the 1960's) asked him in his capacity as attorney for the town to institute such litigation that he would recall that. In any event the court does not perceive that the "awareness" of this matter over a number of years which included prior administrations in the Town and where, as noted, there is no credible evidence to prove that the requisite request and authorization to institute legal action in fact existed, permits the court to accord this evidence the weight and probative value the plaintiffs urge. Moreover, under all the circumstances the fact that despite the claim that some property owners themselves were aware of being "overcharged" long before these cases were started not a single one or more of them was shown to have taken the town to court over this issue, as did the Masonic Charity Foundation on its own initiative, does not avail the plaintiffs on this issue.
In passing on this issue, it is significant to note that the Town, apparently at least since 1980, has been under strong pressure, if not a directive from state environmental authorities to build a more modern sewage water treatment plant because of the pollution problem in the Quinnipiac River contributed to by the then — existing facility which pressure continued into the 1980's. The evidence indicated a much more such modern facility was required. In this context we note that the state may through a state commission order a municipality to construct and maintain a sewage disposal plant to prevent pollution of streams. See State CT Page 5295 Water Commission v. Norwich, 141 Conn. 442, 107 A.2d 270 (1954).
The great increase in the population of Wallingford from the inception of the agreements in the 1950's to the 1980's may be judicially noticed. Nestro Corporation v. Fontaine, 19 Conn. Sup. 160,162 A.2d (1964). The population of Wallingford in 1950 was 16,976, in 1980 it was 32,274 and in 1990 it was estimated to be 42,460. Connecticut State Register and Manual (1990). Moreover, the pressure on the Town of Wallingford, as on other communities, to upgrade and expand its sewage treatment facilities has increased especially because since the late 1960's the standards for the minimum treatment of residential sewage, before the effluent can be released into natural bodies of water, have been raised sharply. Such circumstances may appropriately be considered on the plaintiffs' charges of the conduct of the defendants on punitive damages.
The new sewage treatment plant concerning which the plaintiff's agreements were declared null and void in 1987 and which is apparently now operating or close to doing so is the largest single capital construction project ever undertaken by the Town. At the hearing the evidence indicated that this new plant will cost between $20,000,000.00 and $25,000,000.00 if not more, with at least 75% of the cost coming from grants from the federal and state government. There was also evidence that the original bid for its construction was about $23,500.00.
That the Town was concerned that the agreements might jeopardize such a grant and a court would be "hard pressed" to decide that the Town could terminate the agreements was the view in 1979 of the defendant's assistant town attorney. Accordingly, a waiver was sought to accommodate the agreements. While this shows an awareness of the "impediment" to a sewer grant as the Town Attorney opined, it also clearly demonstrates that it explored this option of trying to accommodate the "impediment" by seeking a waiver. The court does not detect that the Town's motivation in doing so as contributing to support a right to the claimed punitive damages under all the circumstances. Efforts to obtain such relief apparently continued into the 1980's. There was also evidence that even then it was hoped that relevant regulations might change and things could be different. In any event, in 1984, it was determined that special counsel be retained by the town attorney's office to render an expert opinion concerning the validity of the agreements in this case. Such counsel, Attorney Norbert Church, from outside Wallingford, was retained. Retention of special counsel concerning municipality matters is permissible unless expressly prohibited. See e.g. Evanko et al. v. Duff, 633 N.J. Super. 548, 164 A.2d 841 (1960). In recommending the retention of special counsel, Attorney Farrell wrote that such a legal opinion should be obtained "before we ever CT Page 5296 think about suing" and that "it would have to be an attorney outside Wallingford who gives such an opinion and who brings such a suit." It is therefore apparent that even then litigation had not been ruled out as an option to determine validity of the agreements. Church's opinion, however, was not given to Farrell until sometime in November 1986 when Church informed Farrell orally that, in his opinion, the agreements were invalid and that the Town had the power to impose sewer use assessments in excess of the $15. caps on the properties covered by the agreements. Farrell thereupon contacted the water and sewer division of the PUC, who were waiting on Church's opinion, before sending out the higher sewer use bills to owners covered by the agreements. As a result those bills were sent out in December 1986. Had Church's opinion been otherwise, it was Farrell's belief that the billings would not have been made at the higher rates, i.e. in excess of the $15. cap. Church's formal written opinion to Farrell was dated January 29, 1987. Farrell was familiar with its contents because of his oral discussions with Church in late 1986. Church's written opinion was given to Farrell some time after January 29, 1987 but before February 3, 1987. It was on February 3, 1987 that the PUC, relying on Church's opinion, declared the agreements null and void at a public meeting at which inter alia were present Mayor Dickinson, PUC members, Farrell and Church.
Throughout the Mayor relied on the legal advice of town counsel as well as that of Church in the determination of the validity of the agreements. The PUC relied on legal advice for their null and void declaration of February 3, 1987. It appears that Mayor, having earlier obtained authority from the Town Council, the town's legislative body, to apply for and to act to obtain grant aid, acted in good faith and in the interests of the entire city of Wallingford.
It is quite clear that the defendants in endeavoring to obtain the grant funds for the benefit of the entire town of Wallingford were working for a public purpose to benefit the entire community. There can be little, if any question but that such a public purpose had a reasonable relationship to a legitimate governmental interest. In that connection we note that courts have said that it is a legitimate governmental interest to provide and maintain municipal water and sewer systems, and to do this, it is necessary that there be adequate financing. See Chase v. McMasters, 405 F. Sup. 1297, 1302 (D.N.D. 1975); Kimbrought v. Wallingford 371 S.W.2d 691, 693 (Texas 1963). On the matter of financing, the court notes that Wallingford was the last town to obtain financing assistance by way of grant as thereafter the route was that of loan not grant. This factor, reasonably considered, has impact on governmental direction. It brooks of little dissent that the grant aid sought and obtained was for the public welfare of the entire town including the plaintiffs. CT Page 5297
It seems to the court that the more considerate course might well have been to try to notify the owners covered by the agreements that they were going to be billed at the higher rates before they received the higher bills. The circumstance that this, however, did not come about, given the time frame for sending out the sewer use bills for the entire town, does not go. to support proof of any of the requisites for punitive damages.
The court has carefully weighed and considered all the evidence adduced on this issue which seeks to impose punitive damages upon the municipality of Wallingford. The plaintiffs have not proven that they are entitled to punitive damages. The plaintiffs have not proven the claimed reckless indifference to the rights of others or an intentional or wanton violation of the plaintiffs' rights. The basic flavor of punitive damages which is described in terms of wanton and malicious injury, evil motive has simply not been proven. The claim of fraud has not been clearly proven. The plaintiffs' claim for an award of punitive damages is denied.
Turning to the matter of persons to be considered class members so as to be eligible to be awarded damages, the plaintiffs first claim that damages should to awarded to the owners of each of the properties identified in the four agreements excepting from that number only those property owners who have opted out of the two class action suits. In doing so they reject the defendants' claims that only eligible class members who were property owners as of February 3, 1987 may recover damages, and there, the plaintiffs stress that that date is the date that the defendants unilaterally abrogated the contracts the breach of which was recognized on summary judgment. They also, and not without reason, point out that concerning the court-ordered renotification and/or redefinition of the class membership ordered on August 23, 1989 by Fracasse, J. the defendants in open court not only failed to object to that procedure but cooperated with it even providing the plaintiffs with an updated list of owners of the properties covered by the four agreements. On August 23, 1989, the court (Fracasse, J.) inquired, inter alia, in its query of counsel, the necessity of taking into account any changes in ownership since its earlier class action orders in 1987. In its 1989 action the court (Fracasse, J.) indicated that it wanted to be certain "that the requirements with respect to class action have been met and also that all the requirements with respect to Section 388 of the Practice Book on declaratory judgment have been met. . ." before the cases were assigned for trial. Defendants' counsel after stating that he joined with plaintiffs' counsel that the earlier court-ordered published class action notice had been given was then asked by the court at the 1989 hearing "Well, is there a practical way of determining the specific people so that if there has been a CT Page 5298 change of ownership there can be a re-notice?" Defendants' counsel replied: "I was going to say that I would join in with plaintiff's counsel, as said to the Court, as far trying to update the members of the class and give notice to anyone who may have come in and taken ownership of property that's effected."
As a result the defendants thereafter furnished the plaintiffs with such a list. The plaintiffs maintain that the defendant by choosing to cooperate in the court 1989 "update" order have not only waived their right to object to the "current configuration" of the plaintiffs' class but that laches also precludes their belated attack here (on such configuration) until the present hearing in damages, more than a year after that 1989 "update" order. To the defendants' present argument that the court now should order a recertification and/or redefinition of the plaintiff classes to reflect those "who have standing to sue in their own right and whose recovery has not been time-barred" the plaintiffs, answer that none of the plaintiffs' claims are time-barred and also "that the court ordered, most accurately notified classes should remain the classes under discussion for the hearing in damages."
The defendants, nevertheless claim that the list of class membership presented by the plaintiffs at the trial is not an accurate representation of the individuals harmed by the Town's sewer rate increase and the declaration that their sewer use covenants were null and void. Further, they claim that the 335 class membership claimed by the plaintiff is "overinclusive." The defendants make the overall claim that the plaintiffs have failed to sustain their burden of proving damages for 118 class members. Invoking their "de facto taking" claim, they say that the only person entitled to recover damages is the owner as of the date of the alleged taking, i.e. February 3, 1987. Therefore, they contend that 50 class members are barred from obtaining damages because Raymond Dennison's testimony at trial shows that, as of November 1990, 50 members of the Braithwaite class became owners after February 3, 1987. Further, to this alleged barred group, must be added, the defendants argues, "three to five property owners (who) opted out of class action suits."
In addition, they also contend that that number i.e. 335 incorrectly includes 63 class members in Renfrew whose recovery is barred because Raymond Dennison, office manager of the Water and Sewer Division, testified that the sewer rate books back to 1977 indicate that 63 of the 66 Renfrew members were billed for the full sewage charge and, therefore, these 63 are barred by the Statute of Limitations. In making these arguments, the defendants construe the sixth count of the Renfrew complaint as alleging that the plaintiffs claim that the defendants knew of the overcharge to certain of the Renfrew class members, that such conduct of the CT Page 5299 defendants was undertaken so that such Renfrew owners would not complain or discover that the "losses" were included in one of the agreements and that such conduct by the defendants was fraudulent. This claim of fraudulent conduct is resisted by the defendants who say the plaintiffs have not adequately pleaded such a fraudulent concealment as the statute, 52-595 was not pleaded as required citing D'Occhio v. Connecticut Real Estate Commission, 189 Conn. 162,183 455 A.2d 8333 (1983).
It has been said that "In order to raise a claim of fraudulent concealment, the party challenging a statute of limitations defense must affirmatively plead it. D'Occhio v. Connecticut Real Estate Commission, 189 Conn. 162, 182-183,455 A.2d 833. . . ." Beckenstein v. Potter Carrier, 191 Conn. 150,163, 464 A.2d 18 (1983). In any event, the defendants go on, the plaintiffs have not proven fraudulent concealment. In answer to this argument concerning this barring of 63 of the 66 Renfrew class members, the plaintiffs point out that the defendants have pleaded the six year contract statute of limitations (General Statutes 52-576) but it was interposed to only the sixth and seventh counts of the Renfrew complaint and that the defendants never pleaded a statute of limitations defense to the first five counts of that complaint. Therefore, the plaintiffs argue that any such statute of limitations argument the defendant might have applies only to the claim for overpayment in Renfrew. Even there, however, the plaintiffs contend that the defendants should be estopped from relying on a statute of limitations defense to the sixth count because of their fraudulent conduct in these cases; this contention lacks merit as the plaintiffs have not proven such conduct in these cases.
We look first to the matter of the constitution of the classes in these cases. Generally speaking, "Class actions are representation suits on behalf of groups of persons similarly situated . . . (they are) a nontraditional litigation procedure that permits a representative with typical claims to sue or defend on behalf of, and stand in judgment for a class `when the question is of common or general interest to many persons . . . so numerous as to make it impracticable to bring them all to the court.'" 1 Newberg on Class Actions 1.01 (1985). Our practice provides for the maintenance of class actions' Practice Book 86-90. Our class action rules while not exactly the same, are modeled on amended Federal Rule 23 governing class class actions, 3 Newberg, op. cit. appendix 13-1; See General Statutes 52-105 and 1 Moller and Horton, Connecticut Practice 86.
The class certification originally ordered and approved at the outset of this litigation in 1987 remained so until August 1989 when the court (Fracasse, J.) caused that class membership to be updated upon proper notice. This process, as already pointed CT Page 5300 out, was joined in by all counsel and all counsel cooperated in this process. As a matter of fact, the defendants gave the plaintiffs a new list that contained updating the 1987 information to make it current. This list is Exhibit G which the plaintiffs claim contains those who are the class members. It seems fair to say that it is the plaintiffs' burden to establish the membership or configuration of the class or classes that the representative plaintiff i.e. Braithwaite and Renfrew represents in each case. It is similarly fair for the plaintiffs, having been given the list of names in 1989 by the defendants themselves to be able to rely reasonably that the names on that list so given to them were reasonably accurate. Therefore, the name of the owners on Exhibit G or their assigns or successors now constitute the classes in these two cases. In any event, it is significant to remember that, depending upon the resolution below in this opinion of the defendants' claims that certain class members are barred, the starting point is 335 as that is the member of properties that enjoy the benefit of the four agreements involved. Certain opt-outs must, of course, be deducted ultimately from this 335 figure. Fortunately, the flexibility of class action proceedings permit post-judgment proceedings in determining those persons entitled to as to any participate in an award of damages in these cases.
The defendants, as to the "overinclusiveness" claim of the 335 persons who are class members first contend that the .classes should be decreased by 50. There they refer to the testimony of Raymond Dennison that 50 members of the Braithwaite class become owners after July 3, 1987 and, therefore, and they are therefore, barred from recovering damages. The court does not agree. We have already determined above that the four agreements involve covenants running with the land and that these covenants for the $15. sewer use cap pass with the title to the property with which they run or attach. This means that ownership of one of these 335 properties on July 3, 1987 is not crucial to his or her obtaining damages so long as any such post-July 3, 1987 owner now owns property through one who did so on July 3, 1987. Accordingly, this claim is rejected. Of course, a person who was an owner on July 3, 1987 and still is such remains a class member.
The class membership must, of course, be decreased by opt-outs by an owner. It would appear from the files at this point that as a result of the 1987 court order for the classes in these actions that twelve owners opted out. In addition, as a result of the 1989 court order the files seem to indicate that two owners opted out.
Next, the defendants claims that they should be permitted to raise the defense of the statute of limitations. The statute of limitations is an affirmative defense and must be specially pleaded. Orticelli v. Powers, 197 Conn. 9, 14-16, 495 A.2d 1023
CT Page 5301 (1985): Practice Book 164; See 7 McQuillin, Municipal Corporation 49-.35. In both these cases, the only place the statute of limitations is pleaded is in the Renfrew case and there only as to the sixth and seventh counts. That defense is not interposed to any other count in either action, and, specifically, not to any count upon which summary judgment was granted in each action. The sixth count alleges that the defendants fraudulently overcharged some members of the Renfrew class. The seventh count in the Renfrew action is the class action count. Any statute of limitation argument that the defendants has can only go to the claim of those members of the Renfrew class that are claiming overpayment as alleged in count six of that complaint.
As to the plaintiffs claim of fraudulent conduct in the sixth count that evidence upon which the plaintiffs rely solely for this claim has already been set out earlier in this opinion on their punitive damages claim about the conduct of the defendants. "Fraud, of course, is not to be presumed and must be strictly proven by clear, precise and unequivocal evidence. Busker v. United Illuminating Co., 156 Conn. 456, 458, 242 A.2d 708 (1968); DeLuca v. C.W. Blakeslee Sons Inc., 174 Conn. 535, 546 A.2d 170 (1978). The intent to defraud involves a state of mind and may be proven by circumstantial evidence and where conflicting evidence is involved, this presents questions of fact for the trier. DeLuca v. C.W. Blakeslee Sons, supra. 546, 547. Even a cause of action for fraudulent concealment under 52-595 "must, like other frauds, be proved by the more exacting standards of clear, precise and unequivocal evidence" Fichera v. Mine Hill Corporation, 207 Conn. 204,215, 541 A.2d (472 (1988)).
 "To establish that the defendants had fraudulently concealed the existence of their cause of action and so had tolled the statute of limitations, the plaintiffs had the burden of proving that the defendants were aware of the facts necessary to establish this cause of action. . .and that they had intentionally concealed those facts from the plaintiffs." Bound Brook Assn. v. Norwalk, 198 Conn. 660, 665, 504 A.2d 1047, cert. denied. 479 U.S. 819, 107 S.Ct. 81, 93 L.Ed.2d 36 (1986).
The plaintiffs have not proven fraud in these cases, either at common law or under 52-595, on the part of the defendants given the requisite standard of proof incumbent upon them to do so. Keeping in mind that the claim of fraud on this branch of these cases can only go to those Renfrew class members that claim damages for "overpayments" allegedly induced by fraud, it is required that it be proven that a plaintiff relied on defendant's "misrepresentations" or the like. However, 63 of the CT Page 5302 66 members of the Renfrew class were said to have "billed" for sewer charge rate in excess of the $15. cap going back to 1977. That, is not to say how many in fact paid the higher rate. There is no other evidence that even such "billings" were made. Even the bills put in by the Renfrew representative plaintiff himself, Henry Renfrew only showed that such billings were made to him since December 1, 1979 and no earlier; and these are the only such evidence in the Renfrew class suit. This leads to the inquiry as to the date from which the 63 "overpayment" members of the Renfrew case should have their claim for "overpayment" considered.
Because we have concluded that fraud, be it fraudulent concealment or fraud at common law has not been proven by the plaintiffs; the applicable statute of limitations, i.e. General Statutes 52-576 would not be tolled. Because this six year statute of limitations is pleaded to the seventh as well as the sixth count in Renfrew, it requires that we consider its impact as to those 63 of 66 members of the Renfrew class who are alleging "overpayment" prior to February 3, 1987 vis a vis their eligibility to participate in any damages awards concerning claimed "overpayments".
The pleading of the statute of limitations to the seventh count in Renfrew, accordingly, affects the claims advanced by the 63 alleged "overpayment" members of that class. Section 52-576
provides "No action . . . on any contract in writing, shall be brought but within six years after the right of action accrues. . . ." The law as to when a breach of contract action "accrues" was set out in Kennedy v. Johns-Manville Sales Corporation, 135 Conn. 176, 180, 62 A.2d 771 (1948) where our Supreme Court said that "in an action for breach of contract . . . the cause of action is complete at the time the breach of contract occurs, that is, when the injury has been inflicted." In reaffirming that principle in Beckenstein v. Potter Carrier Inc., 191 Conn. 150, 156 464 A.2d 18 (1983) the court also drew or Kennedy in observing that while "`The application of [this] rule may result in occasioned hardship,' it is well established that ignorance of the fact that damage has been done does not prevent the running of the statute, except where is something tantamount to a fraudulent concealment of a cause of action. . . ." Beckenstein v. Potter Carrier, Inc., supra 156. There has been no such fraudulent concealment here and actually the evidence would indicate that many of the conveyances explicitly refer to the agreement recorded in the Wallingford land records clearly setting out the $15. cap on the sewer use charge which puts the owner or notice of it. Even where the agreement may not have been explicitly referred to in a particular deed, the agreement itself is recorded and such an owner fairly has constructive notice of it given the consistent policy of our law that the land records should be the "authentic oracle" of recorded matters that affect CT Page 5303 his property. See Peckheiser v. Tarone, 186 Conn. 53, 58,430 A.2d 1192 (1982). In any event, the breach of contract for purposes of determining the application of the six year statute of limitations in 52-576 occurred on February 3, 1987 and, therefore, any billings for sewer use charges dated prior to February 3, 1981 are barred by the six year statute of limitations in 52-576.
It is pointed out that some time ago the court (Fracasse, J.) determined that the prerequisites to class action status were met in this case (as well as in Braithwaite) including the prerequisite that there were questions of law or fact common to the class. Practice Book 87. When common questions, which apparently applies to 63 of the 66 Renfrew members represent a significant aspect of the case and they can be resolved in a single action, class action status was appropriate. See 7A, Wright, Miller and Kane; Federal Practice and Procedures 1778 at p. 528. The common questions, however, need not be dispositive of the entire action, because "predominate" as used in the rule should not automatically be equated with "determinative" or "significant". See 7A Wright, Miller and Kane, supra 1778 pp. 528-529, Practice Book 88. As one court has said: "It is not necessary that the individual claims be carbon copies of each other. Our authority has observed that:
 ". . .courts have held that [a class] action can be brought . . . even though there is not a complete identity of facts relating to all class members, as long as a `common nucleus of operative facts' is present. . . . The common questions need not be dispositive of the entire action. In other words, `predominate' should not be automatically equated with `determinative' or `significant'. Therefore, when one or more of the central issues in the action are common to the class and can be said to predominate, the [class] action will be considered proper. . . . 7A Wright Miller, supra 1778, at 53." Vignaroli v. Blue Cross of Iowa, 360 N.W.2d 741, 745 (Iowa 1985); See also Clothesrigger Inc. v. GTE Corp., 236 Cal Rptrs. 605, 611, 191 Cal.App. 31, 605
(1987). In a word, the necessity for class members to prove their own damages does not mean that the class is not as ascertainable or that individual facts questions "predominate." See Clothesriger Inc. v. GTE Corporation, et al., supra. As on commentator notes, according to Judge Frankel:
 "It is broadly implicit that a single determination by representative parties alone CT Page 5304 cannot in itself decide the claims or defenses of all class members, it is assumed that individual questions peculiar to individual class members, but overweighed by the common questions, will or may remain after the common questions have been finally determined." 713 Wright, Miller Kane, supra, 1784, p. 533; See Frankel, J. "Some Preliminary Observations concerning Civil Rule 23, 1967"43 F.R.D. 39, 43.
As indicated above Raymond Dennison testified that 63 of the 66 members of the Renfrew class have been billed at the higher rate, i.e. in excess of the $15. sewer use cap, since 1977 according to the rate books in his office. The court interprets this testimony, to mean 63 of those owners whose names appear on Exhibit G. It is again noted that Renfrew and Baithwaite are different in that in both cases the class members are seeking damages from February 3, 1987 prospectively to June 1, 1990 and from June 1, 1990 for the balance of the years left on the agreements whereas in Renfrew some class members are seeking additional damages for alleged "overpayments" i.e. in excess of the $15. cap. for a period prior to February 3, 1987 which this court has decided is to start with billings dated December 1, 1981.
In brief summary on the class membership or configuration issue, the class members in Braithwaite includes those persons who owned property on February 3, 1987 covered by the agreements encompassing Westview and Kingsland and who continue to do so as well as including any person who owns any such property by virtue of being a successor or assign of a person or persons who did own such property on February 3, 1987.
The class members in Renfrew includes (1) those persons who owned property on February 3, 1987 covered by the agreements encompassing Norshap and Rosewood and who continue to do so as well as including any person who owns any such property by virtue of being a successor or assign of a person or persons who did own such property on February 3, 1987 and (2) those persons (those in the so-called "overpayment" group) who now own and did own property between December 1, 1981 and February 3, 1987 covered by the agreements encompassing Norshap and Rosewood who were billed for sewer use rates in excess of the $15. sewer use cap and paid any such billings.
The court concludes and agrees with the plaintiffs that the class in Braithwaite and Renfrew is composed of those persons listed on plaintiffs' Exhibit G or their successors or assigns who own any of the 335 properties included in the four agreements (Westview, Kingsland, Rosewood, Norshap) minus those persons who CT Page 5305 have "opted-out" out of each class.
Accordingly, judgment is entered for the plaintiff class against the defendants in each case, i.e. Braithwaite v. Wallingford, et al. (Docket #262168) and Henry Renfrew v. Wallingford, et al (Docket #262169) in accordance with the foregoing.*
Arthur Haley State Trial Referee
*It is apparent from the judgment of the court in favor of the plaintiff classes that certain steps are to be taken to implement this judgment, including particularly the payment by the defendants to class members of the damages to which each may be entitled. It is, therefore, appropriate that certain orders will need to be entered concerning that implementation. These should address, but not necessarily be limited to, such matters as the following:
1. The amount in dollars that each class member in Braithwaite and Renfrew is entitled to be paid as damages for a period subsequent to February 3, 1987;
2. The amount in dollars that each class member of the "overpayment" group is Renfrew is entitled to be paid as damages for billings and payments in excess of the $15 per annum sewer use cap during the period beginning December 1, 1981 up to and including February 2, 1987.
2. A proper "Request for Payment of Damages" form for paragraphs 1 and 2 above.
3. The designation of a proper person with whom individual "Request for Payment of Damages" are to be filed for the purpose of seeking such payment and who, after court approval of the same shall forward any such approved "Request to the Payments" to the defendant Town for payment.
4. A notice to be sent by regular mail to each member of the plaintiff classes advising them that the request of each such member will be paid upon receipt of a properly executed "Request for Payment of Damages" form by the class member to the person designated under paragraph 2 above and upon the approval of this court or its designee (s).
5. In addition to the notice by regular mail, there shall be published once each week for three consecutive weeks in a newspaper having a general circulation on the Town of Wallingford the notice referred to in paragraph 4 above. CT Page 5306
6. A cut-off date for the filing of any "Request for Payment of Damages" which date shall be not less than six months from the last date of publication in the newspaper actually utilized pursuant to paragraph 5 above.
7. Following the cut-off date for the filing of "Request for Payment of Damages" and the payment of all proper claims, the person designated under paragraph 3 above who receives and approves "Request for Payment of Damages" shall make and file with the court a report of his doings. Once this court accepts the report referred to in the preceding sentence the judgments entered in Braithwaite and Renfrew shall be deemed to have been fully satisfied and anything remaining of the total amount of dollar awarded which have not been paid out shall be returned to the defendant Town. The same procedure shall be followed after the cut-off date as to any "Request for Payment of Damages" made by any member of the so-called "overpayment" group in the Renfrew case.
8. Any other order deemed appropriate to implement the judgment entered herein in Braithwaite and/or Renfrew.
This court will set the time and place for a hearing on the matters that may be necessary to implement the judgment entered in these two cases.
FOOTNOTES